Oral Argument Not Yet Scheduled

**No. 13-5290**

---

IN THE

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

NATIONAL ASSOCIATION OF HOME BUILDERS, *et al.*,

*Plaintiffs-Appellants*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, *et al.*,

*Defendants-Appellees*.

_____

**OPENING BRIEF OF APPELLANTS**
_____

Appeal from the U. S. District Court for the District of Columbia
No. 13-CV-00078 (Hon. Ellen Segal Huvelle)
_____

Norman D. James
Aaron T. Martin
Fennemore Craig, P.C.
2394 East Camelback Road
Suite 600
Phoenix, AZ  85016
Telephone (602) 916-5346
E-mail  njames@fclaw.com
         amartin@fclaw.com
*Attorneys for Plaintiffs-Appellants*

## CERTIFICATE AS TO PARTIES, RULINGS,
## AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the National Association of Home Builders, the Southern Arizona Home Builders Association, and the Home Builders Association of Central Arizona (collectively, "Home Builders") certify as follows:

**1.     Parties and Amici.**  The Appellants (Plaintiffs below) are the National Association of Home Builders, the Southern Arizona Home Builders Association, and the Home Builders Association of Central Arizona.  The Appellees (Defendants below) are the U.S. Environmental Protection Agency; Gina McCarthy, in her official capacity as the Administrator of the U.S. Environmental Protection Agency; the U.S. Army Corps of Engineers; and Lt. Gen. Thomas P. Bostick, in his official capacity as Commanding General and Chief of Engineers of the U.S. Army Corps of Engineers.  No intervenors or amici have participated in this case.

**2.     Ruling Under Review.**     In this case, Appellees U.S. Environmental Protection Agency and U.S. Army Corps of Engineers, without notice or opportunity to comment, classified portions of the Santa Cruz River in southern Arizona as "traditional navigable waters."  Home Builders challenged the agencies' navigability determinations under the

i

judicial review provisions of the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.*

By Order (Doc. 24), issued on July 26, 2013, U.S. District Judge Ellen Segal Huvelle granted Appellees' Motion to Dismiss all of Home Builders' claims, thereby denying all relief sought by Home Builders. Judge Huvelle's Memorandum Opinion (Doc. 23) explains the basis for dismissing the case. Home Builders appeal from and seek review of the Order dismissing their case.

**3.** **Related Cases.** There are no related cases pending.

## CORPORATE DISCLOSURE STATEMENT

Appellant National Association of Home Builders ("NAHB") is a non-profit corporation organized under the laws of Nevada. NAHB has no parent companies or subsidiaries and has issued no shares of stock to the public. It is comprised of approximately 800 state and local home builders associations with whom it is affiliated, but all of those associations are, to the best of NAHB's knowledge, non-profit corporations that have not issued stock to the public.

Appellant Southern Arizona Home Builders Association ("SAHBA") is a non-profit corporation organized under the laws of Arizona and headquartered in Tucson. SAHBA has no parent companies or subsidiaries and has issued no shares of stock to the public. It has approximately 350 members, including home builders, real estate developers, and other businesses involved in the home building industry in southern Arizona, including Pima County.

Appellant Home Builders Association of Central Arizona ("HBACA") is a non-profit corporation organized under the laws of Arizona and headquartered in Phoenix. HBACA has no parent companies or subsidiaries and has issued no shares of stock to the public. It has approximately 500 members, including home builders, real estate

developers, other businesses involved in the home building industry in central Arizona, including Maricopa and Pinal Counties.

SAHBA and HBACA are members of and affiliated with NAHB.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ................................................................................ i

CORPORATE DISCLOSURE STATEMENT ......................................... iii

TABLE OF AUTHORITIES ................................................... vii

GLOSSARY OF ABBREVIATIONS ..............................................xv

JURISDICTIONAL STATEMENT ...............................................1

STATEMENT OF THE ISSUES ...............................................2

STATUTES AND REGULATIONS...............................................3

STATEMENT OF THE CASE .................................................3

STATUTORY AND REGULATORY BACKGROUND ............................7

    I.     Overview of the Clean Water Act's Principal Permitting Programs................................................................7

    II.    The Definition of "Waters of the United States" and the Impact of the *Rapanos* Decision. ...............................9

    III.   How Navigability Determinations Differ From Jurisdictional Determinations...............................13

STATEMENT OF FACTS ..................................................16

    I.     The Agencies' TNW Determination.......................16

         A.    The Santa Cruz River and Study Reaches A and B. .....16

         B.    The Agencies' Decision-making Process. ...................17

    II.    The Adverse Impacts of the TNW Determination on Home Builders' Members. ...................................19

         A.    Jerry DeGrazia. ...........................................22

         B.    Larry Kreis...............................................23

         C.    Albert LeCocq. ...........................................24

SUMMARY OF THE ARGUMENT ...........................................25

ARGUMENT...............................................................28

    I.     Standard of Review...........................................28

# TABLE OF CONTENTS
(continued)

Page

II.     The District Court Improperly Dismissed Home
Builders' Claims for Lack of Standing. ..................................29

    A.     The Elements of Article III Standing. ..........................29

    B.     The District Court Used an Incorrect Legal
Standard to Evaluate Home Builders' Standing. ..........31

    C.     The Regulated Community Normally Has
Standing to Bring Facial Challenges to Agency
Rules That Regulate Their Members' Activities. .........34

    D.     The District Court Mischaracterized Home
Builders' Declarations and the Injuries Their
Members Suffered as a Result of the TNW
Determination. .............................................................38

    E.     Home Builders Have Established Standing to
Challenge the Agencies' Failure to Comply With
the APA. ......................................................................48

III.    The TNW Determination Is Final Agency Action. .................51

    A.     The TNW Determination Is Final and Binding on
the Agencies. ...............................................................53

    B.     The District Court Erred in Holding that the TNW
Determination Is Not Final Agency Action. .................58

        1.     The TNW Determination Is Final.......................58

        2.     The TNW Determination Alters Rights and
Obligations and Has Legal Consequences..........61

CONCLUSION .......................................................................................64

CERTIFICATE OF COMPLIANCE.........................................................65

# TABLE OF AUTHORITIES

**Page**

*Action Alliance of Senior Citizens of Greater Phila. v. Heckler*,
   789 F.2d 931 (D.C. Cir. 1986) ..........................................................33

*Appalachian Power Co. v. EPA*, 208 F.3d 1015 (D.C. Cir. 2000) .........56, 59

*Babbitt v. Sweet Home Chap. of Communities for a Greater Or.*,
   515 U.S. 687 (1995)..........................................................................35

*Belle Co., LLC v. U.S. Army Corps of Engineers*,
   2013 WL 773730 (M.D. La. Feb. 23, 2013) ......................................61

*Bennett v. Spear*, 520 U.S. 154 (1997) ...................................................52, 56

*Cellco P'ship v. FCC*, 357 F.3d 88 (D.C. Cir. 2004) ...................................44

*City of Waukesha v. EPA*, 320 F.3d 228 (D.C. Cir. 2003) ...........................33

*Cohen v. United States*, 578 F.3d 1 (D.C. Cir. 2009)...................................56

*CropLife Am. v. EPA*, 329 F.3d 876 (D.C. Cir. 2003) .................................57

*Defenders of Wildlife v. Gutierrez*, 532 F.3d 913 (D.C. Cir. 2008)........ 32-33

*El Paso Natural Gas Co. v. United States*, 632 F.3d 1272
   (D.C. Cir. 2011) ......................................................................... 28-29

*Elec. Power Supply Ass'n v. FERC*, 391 F.3d 1255 (D.C. Cir. 2004)..........31

*Fairbanks North Star Borough v. U.S. Army Corps of Engineers*,
   543 F.3d 586 (9th Cir. 2008)........................................................53, 62

*Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658 (D.C. Cir. 1996) ...................30

*Fund for Animals, Inc. v. Norton*, 322 F.3d 728 (D.C. Cir. 2003) ......... 35-37

***Appellants do not chiefly rely on any authorities.***

# TABLE OF AUTHORITIES
(continued)

**Page**

*Gen. Elec. Corp. v. EPA*, 290 F.3d 377 (D.C. Cir. 2002) .................57, 62-63

*Hampton Venture No. One v. United States*, 768 F. Supp. 174
    (E.D. Va. 1991)..........................................................................59, 60

*Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333 (1977) ...............29

*Lotz Realty Co. v. United States*, 757 F. Supp. 692 (E.D. Va. 1990) ...........59

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)........................30, 32, 46

*McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317 (D.C. Cir. 1988)....63

*Nat'l Air Traffic Controllers Ass'n v. Fed Serv. Impasses Panel*,
    606 F.3d 780 (D.C. Cir. 2010) .........................................................29

*Nat'l Ass'n of Home Builders v. EPA*, 731 F. Supp. 2d 50 (D.D.C. 2010).....6

*Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6 (D.C. Cir. 2011) .............6

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
    417 F.3d 1272 (D.C. Cir. 2005) ...................................... 27, 30, 34, 37

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
    440 F.3d 459 (D.C. Cir. 2006) ....................................................34, 63

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399
    (D.C. Cir. 1998) ...................................................................34-35, 63

*Natural Res. Def. Council v. EPA*, 643 F.3d 311
    (D.C. Cir. 2011).............................................................51-52, 57, 63

*PPL Montana, LLC v. Montana*, -- U.S. --, 132 S.Ct. 1215 (2012) ......4, 9-10

*Pub. Citizen v. Lockheed Aircraft Corp.*, 565 F.2d 708 (D.C. Cir. 1977) ....34

# TABLE OF AUTHORITIES
(continued)

**Page**

*Rapanos v. United States*,
547 U.S. 715 (2006)............................3, 4, 8, 9, 11, 20, 26, 34, 37, 41

*Route 26 Land Dev. Ass'n v. U.S. Gov't*, 753 F. Supp. 532
(D. Del. 1990)............................................................. 59-60

*Sackett v. EPA*, -- U.S. --, 132 S.Ct. 1367 (2012)....................................6, 60

*Sierra Club v. EPA*, 292 F.3d 895 (D.C. Cir. 2002) ....................................30

*Small Refiner Lead Phase-Down Task Force v. EPA*,
705 F.2d 506 (D.C. Cir. 1983) ........................................................48

*S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe*, 541 U.S. 95 (2004).............8

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) .......................32

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009)............................. 49-50

*Syncor Int'l Corp. v. Shalala*, 127 F.3d 90 (D.C. Cir. 1997) .......................56

*The Center for Law and Educ. v. Dep't of Educ.*, 396 F.3d 1152
(D.C. Cir. 2005)..................................................................29

*The Daniel Ball*, 77 U.S. 557 (1870)........................................................9

*United States v. Students Challenging Regulatory Agency Procedures*,
412 U.S. 669 (1973)................................................................. 33-34

*Warth v. Seldin*, 422 U.S. 490 (1975).......................................................32

## STATUTES

**Administrative Procedure Act, 5 U.S.C. § 551, *et seq.***

5 U.S.C. § 551(13) .......................................................................51

## TABLE OF AUTHORITIES
(continued)

**Page**

5 U.S.C. § 701 ......................................................................1

5 U.S.C. § 702 ......................................................................1

5 U.S.C. § 704 ....................................................... 1, 51, 55

5 U.S.C. § 706 ......................................................................1

5 U.S.C. § 706(2)(A) ...........................................................5

5 U.S.C. § 706(2)(C) ...........................................................5

5 U.S.C. § 706(2)(D) ...........................................................5

**Clean Water Act, 33 U.S.C. §§ 1251-1387**

33 U.S.C. §§ 1251-1387.......................................................3

33 U.S.C. § 1311(a) .........................................................7, 9

33 U.S.C. § 1342.................................................................8

33 U.S.C. § 1344.................................................................8

33 U.S.C. § 1344(a) ...........................................................8

33 U.S.C. § 1362(7) ..........................................................10

**Other Federal Statutes**

28 U.S.C. § 1291.................................................................1

28 U.S.C. § 1331.................................................................1

28 U.S.C. § 2201.................................................................1

**AGENCY RULES AND REGULATIONS**

33 C.F.R. pt. 331.................................................................14

# TABLE OF AUTHORITIES
(continued)

**Page**

33 C.F.R. § 320.1(a)(2) ................................................................. 14, 60

33 C.F.R. § 320.1(a)(6) ................................................. 28, 54, 58, 59, 60, 61

33 C.F.R. § 328.3(a) ....................................................................... 10

33 C.F.R. § 328.3(a)(1) ................................................................... 10

33 C.F.R. § 328.3(a)(2)-(5) .............................................................. 10

33 C.F.R. § 328.3(a)(3) ................................................................... 10

33 C.F.R. § 331.2 ............................................................... 14, 15, 59

33 C.F.R. § 331.4 ......................................................................... 14

40 C.F.R. § 122.26(a)(9)(i)(B) ............................................................ 8

40 C.F.R. § 122.26(b)(15) ................................................................. 9

40 C.F.R. § 232.2 ......................................................................... 10

## FEDERAL RULES OF PROCEDURE

Federal Rule Civil Procedure 57 ........................................................... 1

## OTHER AUTHORITIES

Clean Water Act Jurisdiction Following the U.S. Supreme
Court's Decision in *Rapanos v. United States* &
*Carabell v. United States* (Dec. 2, 2008) ........................................ 11-12

*Final Rule for Regulatory Programs of the Corps of Engineers*,
51 Fed. Reg. 41206 at 41207 (Nov. 13, 1986) ......................................... 54

*Final Rule Establishing an Administrative Appeal Process for the
Regulatory Program of the Corps of Engineers*, 64 Fed. Reg. 11708
(Mar. 9, 1999) ......................................................................... 60

# TABLE OF AUTHORITIES
(continued)

**Page**

*Final Rule Establishing an Administrative Appeal Process for the Regulatory Program of the Corps of Engineers*, 65 Fed. Reg. 16486, 16488 (Mar. 28, 2000)...............................................................58, 60

*General Permit for Stormwater Discharges from Construction Activities*, 77 Fed. Reg. 12286 (Feb. 29, 2012)..............................................9

*Government Accounting Office, Corps of Engineers Needs to Evaluate Its District Office Practices in Determining Jurisdiction*, GAO-04-297, at 26 (2004) .......................................................41

*Memorandum of Agreement Concerning the Determination of the Geographic Jurisdiction of the Section 404 Program and the Application of the Exemptions under Section 404(f) of the CWA* (Rev. Jan. 1993) ("Geographic Jurisdiction Memorandum"), *available at* http://www.usace.army.mil/Portals/2/ docs/civilworks/mous/404f2.pdf......19

*Regulatory Guidance Letter No. 08-02, Jurisdictional Determinations* 1 (June 28, 2008) ........................................................................... 14, 15, 41

U.S. Army Corps of Engineers, *Jurisdictional Determination Form Instructional Guidebook* 7 (May 30, 2007), available at http://www.usace.army.mil/Portals/2/docs/civilworks/regulatory/cwa_guide/ jd_guidebook_051207final.pdf ............................................................ 12-13

U.S. Army Corps of Engineers, New York District, *Jurisdictional Determinations*, http://www.nan.usace.army.mil/ Missions/Regulatory/ Jurisdictional Determinations.aspx (visited Feb. 26, 2014) .........................43

U.S. Army Corps of Engineers, Savanna District, *Wetland Determinations*, http://www.sas. usace. army.mil/ Missions/Regulatory/ JurisdictionalDetermination/Wetland Delineations.aspx (visited Feb. 26, 2014) .............................................................................................43

U.S. Army Corps of Engineers, Vicksburg District, *Jurisdictional Determinations*, http://www.mvk. usace.army.mil/Missions/Regulatory/ JurisdictionalDeterminations.aspx (visited Feb. 26, 2014) .........................43

# TABLE OF AUTHORITIES
(continued)

**Page**

U.S. Army Corps of Engineers, Philadelphia District, *Jurisdictional Determinations*, http://www.nap.usace.army.mil/Missions/Regulatory/ JurisdictionalDeterminations.aspx (visited Feb. 26, 2014) ................... 42-43

U.S. Army Corps of Engineers, San Francisco District, *Wetland Delineations and Jurisdictional Determinations*, http://www.spn.usace.army .mil/ Missions/Regulatory/JurisdictionDeterminations.aspx (visited Feb. 26, 2014) ................................................................................42

A.R.S. §§ 49-255 to 255.03..........................................................................8

# GLOSSARY OF ABBREVIATIONS

**APA**          Administrative Procedure Act, 5 U.S.C. § 551, *et seq.*

**CWA**          Clean Water Act, 33 U.S.C. §§ 1251-1387.

**Corps**          U.S. Army Corps of Engineers.

**Corps TNW Determination**    The decision issued by Col. Thomas H. Mangess, Commander of the Corps' Los Angeles District, on May 23, 2008, declaring that 50 miles of the Santa Cruz River are traditional navigable waters (reproduced in the Appendix).

**EPA**          U.S. Environmental Protection Agency.

**EPA TNW Determination**    The decision issued by Benjamin H. Grumbles, EPA's Assistant Administrator for Water, on December 3, 2008, affirming the Corps TNW Determination (reproduced in the Appendix).

**JD**          Jurisdictional determination.

**NPDES**          The National Pollutant Discharge Elimination System created by the Clean Water Act.

**NPDES General Construction Permit**    *General Permit for Stormwater Discharges from Construction Activities*, 77 Fed. Reg. 12286 (February 29, 2012).

**Rapanos Guidance**    A guidance document entitled "Clean Water Act Jurisdiction following the U.S. Supreme Court's Decision in *Rapanos v. United States* & *Carabell v. United States*," issued by EPA and the Army Corps of Engineers on December 2, 2008.

**Significant-nexus test**    The test adopted by Justice Kennedy in his concurring opinion in *Rapanos v. United States*, 547 U.S. 715, 759-87 (2006), for determining when non-navigable tributaries and adjacent wetlands are subject to regulation under the Clean Water Act.

## GLOSSARY OF ABBREVIATIONS

(continued)

**TNW**          Traditional navigable waters, i.e., a water body that is navigable under the Supreme Court's traditional navigability test. *See Rapanos v. United States*, 547 U.S. 715, 723 (plurality), 760-61 (Justice Kennedy concurring in the judgment) (2006).

**TNW Determination**          A collective reference to the Corps TNW Determination declaring that 50 miles of the Santa Cruz River are traditional navigable waters as affirmed by the EPA TNW Determination.

**USGS**          U.S. Geological Survey.

## JURISDICTIONAL STATEMENT

The National Association of Home Builders ("NAHB"), Southern Arizona Home Builders Association ("SAHBA"), and Home Builders Association of Central Arizona ("HBACA") (collectively, "Home Builders") brought this action on behalf of their members under the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.*, to set aside the unwarranted decisions of the U.S. Environmental Protection Agency ("EPA") and the U.S. Army Corps of Engineers ("Corps") (collectively, the "Agencies") classifying portions of the Santa Cruz River as navigable waterways.

The district court had jurisdiction under the APA, 5 U.S.C. §§ 702, 704, and 706. The district court also had jurisdiction pursuant to 28 U.S.C. § 1331 for claims arising under federal laws. Home Builders sought relief under § 706 of the APA through 28 U.S.C. § 2201 (declaratory judgment) and Fed. R. Civ. P. 57 (declaratory relief).

On July 26, 2013, the district court dismissed Home Builders' claims for lack of subject matter jurisdiction, thereby denying all of the relief sought. Home Builders timely appealed on September 23, 2013. Therefore, this appeal is from a final order that disposed of all claims asserted by the parties, and this Court's jurisdiction rests on 28 U.S.C. § 1291.

## <u>STATEMENT OF THE ISSUES</u>

The Agencies, without notice and comment, designated portions of the Santa Cruz River as navigable waterways (the "TNW Determination"). The district court dismissed Home Builders' challenge to the TNW Determination, concluding that Home Builders lacked Article III standing and, in the alternative, that the TNW Determination was not final agency action. The issues before this Court are as follows:

1.   Because Home Builders and their members suffer from increased regulation and costs directly related to the TNW Determination, do Home Builders have standing to bring their claims?

2.   The TNW Determination is binding on the Agencies and is being used to regulate Home Builders' members in southern Arizona. Is the TNW Determination final agency action appropriate for judicial review?

## STATUTES AND REGULATIONS

The pertinent statutes, regulations and agency policy documents are set forth in the Addendum at the conclusion of this brief.

## STATEMENT OF THE CASE

Before the Supreme Court's decision in *Rapanos v. United States*, 547 U.S. 715 (2006), whether the Santa Cruz River was a navigable-in-fact waterway was largely irrelevant, at least as far as the Agencies' enforcement of the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251-1387, was concerned. As discussed in *Rapanos*, the Agencies routinely asserted jurisdiction over natural and manmade channels and ditches – including dry washes and arroyos in the desert – as "tributaries," without regard to their proximity and relationship to a traditional navigable water. *Rapanos*, 547 U.S. at 725-27 (plurality opinion). Back then, the Agencies regulated "virtually any land feature over which rainfall or drainage passes and leaves a visible mark." *Id.* at 725.

In *Rapanos*, however, the Supreme Court limited the Agencies' CWA jurisdiction. Four justices held that wetlands must be adjacent to "a relatively permanent body of water *connected to traditional interstate navigable waters*" and possess "a continuous surface connection with that water" to be regulated. *Id.* at 742 (emphasis added). Justice Kennedy, in his

concurring opinion, explained that the Corps' jurisdiction over wetlands depends on whether they have "a *significant nexus with navigable-in-fact waters.*" *Id.* at 784-85 (emphasis added).[1]   Thus, under either test, the wetlands' relationship to a navigable waterway under the traditional judicial navigability test is determinative.

Afraid of having its CWA jurisdiction restricted after *Rapanos*, the Corps' Los Angeles District declared without notice or public comment that more than 50 miles of the Santa Cruz River constitute traditional navigable waters.   EPA Headquarters then reviewed and affirmed the Corps' navigability decision as a "special case," and directed that the decision be immediately implemented in the field.   These decisions are collectively called the TNW Determination.   The TNW Determination is binding on the Agencies and must be used in making permitting and enforcement decisions in the Santa Cruz River watershed, which contains roughly 8,600 square miles – 5.5 million acres – in southern Arizona, including the Tucson

---

[1] The term "traditional navigable waters" is not used in the CWA or in any other federal statute or agency regulation administered by the EPA or Corps. Instead, it refers to waters traditionally regulated by the federal government as navigable waterways under the Commerce Clause based on their ability to form a continuous interstate highway for water-borne commerce. *See, e.g.*, *PPL Montana, LLC v. Montana*, -- U.S. --, 132 S.Ct. 1215, 1226-29 (2012) (discussing the nature and applicability of the traditional "navigability-in-fact" test).

metropolitan area.  In short, the TNW Determination changed the regulatory landscape in southern Arizona.

The TNW Determination has directly and adversely affected the use of real property, investment decisions, and project development choices of Home Builders' members in the Santa Cruz River watershed by extending CWA jurisdiction, consistent with *Rapanos*, to remote tributaries and ephemeral drainage features based on their proximity and relationship to the Santa Cruz River.  Consequently, Home Builders brought suit on behalf of themselves and their members owning land in the Santa Cruz River watershed, challenging the TNW Determination on both procedural and substantive grounds.

First, Home Builders allege that the TNW Determination constitutes a legislative rule that was adopted without observing the APA's procedures for rulemaking, including public notice and an opportunity to submit evidence and comments.  *See* 5 U.S.C. § 706(2)(A), (C) & (D).  Second, Home Builders allege that the TNW Determination is substantively defective because it is unsupported by credible evidence that the Santa Cruz River is currently – or ever was – susceptible of use as a "highway" for water-borne interstate commerce under the judicial test for navigability.  *See* 5 U.S.C. § 706(2)(A) & (C).

Home Builders previously challenged the TNW Determination in 2009. The district court dismissed that complaint, stating that Home Builders' claims were precluded by the CWA, relying on a line of cases involving pre-enforcement disputes between landowners and the Agencies. *See Nat'l Ass'n of Home Builders v. EPA*, 731 F. Supp. 2d 50, 53-56 (D.D.C. 2010). These cases were subsequently overruled by the Supreme Court in *Sackett v. EPA*, -- U.S. --, 132 S.Ct. 1367 (2012).

Home Builders appealed, and in 2011, this Court issued its decision in *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6 (D.C. Cir. 2011) ("*NAHB v. EPA*"), which affirmed the dismissal on the alternative jurisdictional ground that Home Builders lacked standing. 667 F.3d at 9. At bottom, the Court held that Home Builders failed to provide evidence that any individual association member is likely to suffer an injury-in-fact fairly traceable to the TNW Determination based on the manner in which his property is regulated under the CWA. *See, e.g.*, *id.* at 12 (Home Builders must show "at least one of its members" is under threat of injury), 13 (Home Builders did not explain how the TNW Determination affects either "the manner of regulation" or the "types of watercourses" subject to regulation), 14 (Home Builders failed to provide "an additional allegation that the TNW substantially increased the risk of regulation or enforcement relating to particular property").

Home Builders filed a new complaint in 2013, with allegations intended, *inter alia*, to support Article III standing under the Court's reasoning in *NAHB v. EPA*. The Agencies again moved to dismiss Home Builders' complaint for lack of subject matter jurisdiction on several grounds, including lack of Article III standing and lack of final agency action. Home Builders, in opposing the motion, submitted declarations from three association members who are subject to regulation under the TNW Determination. Appendix ("APP"), APP116-419. The district court granted the Agencies' motion, ruling that Home Builders failed to allege facts, in the complaint or the declarations, sufficient to demonstrate standing at the pleading stage of the case. APP420-434. The district court also held in the alternative that the TNW Determination is not a final agency action under the APA and is not subject to judicial review. APP434-440

Home Builders appeal the district court's order of dismissal and, for the reasons set forth below, ask the Court to reverse the district court and remand this case for proceedings on the merits of Home Builders' claims.

## STATUTORY AND REGULATORY BACKGROUND

### I.  OVERVIEW OF THE CLEAN WATER ACT'S PRINCIPAL PERMITTING PROGRAMS.

The CWA generally prohibits "the discharge of any pollutant by any person," 33 U.S.C. § 1311(a), unless authorized under one of the Act's

permitting programs.  Two such programs are relevant here.  First, Section 404 of the CWA, 33 U.S.C. § 1344, authorizes the Corps (with oversight by EPA) to issue permits "for the discharge of dredged or fill material into the navigable waters at specified disposal sites."  33 U.S.C. § 1344(a); *see also Rapanos*, 547 U.S. at 723 (summarizing Section 404 permits).  Under the Section 404 program, regulated "discharges" include placing clean fill material into a watercourse or wetland area in connection with routine construction activities.  This regulatory program imposes significant burdens on the regulated community.  *See Rapanos*, 547 U.S. at 721.

Second, Section 402 of the CWA, 33 U.S.C. § 1342, authorizes EPA, or a state with an approved program, to issue permits for discharges of pollutants other than dredge or fill material into navigable waters.  This program is called the National Pollutant Discharge Elimination System, or NPDES program.  *See, e.g.*, *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe*, 541 U.S. 95, 102 & 104-05 (2004) (discussing the NPDES program).[2] Under this program, an NPDES permit is required for all construction activities disturbing one or more acres of land that will result in a discharge into waters of the United States.   40 C.F.R.  §§ 122.26(a)(9)(i)(B),

---

[2]  In Arizona, the NPDES program is administered by the Arizona Department of Environmental Quality and is called the AZPDES program. *See* A.R.S. §§ 49-255 to 255.03.

122.26(b)(15).  As a condition of the permit, landowners must implement a stormwater pollution prevention plan that includes control measures to minimize pollutants discharged from the construction site.  *See General Permit for Stormwater Discharges from Construction Activities*, 77 Fed. Reg. 12286 (February 29, 2012).

## II.    THE DEFINITION OF "WATERS OF THE UNITED STATES" AND THE IMPACT OF THE *RAPANOS* DECISION.

To be regulated under the CWA, an activity must involve a discharge into "navigable waters."  *See* 33 U.S.C. § 1311(a).  As explained in *Rapanos*, however, this term is *not* synonymous with traditional, navigable-in-fact waters.  547 U.S. at 723-24 (plurality opinion), 760-61 (Kennedy, J., concurring in the judgment).  In the seminal case on navigability, *The Daniel Ball*, 77 U.S. 557 (1870), which concerned the limits of federal regulation of navigation under the Commerce Clause, the Supreme Court held:

> Those rivers must be regarded as public navigable rivers in law which are navigable in fact.  And they are navigable in fact when they are used, or are susceptible of being used in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water.

*Id.* at 563.  Subsequent decisions have refined this test, but it has remained largely unchanged for 140 years.  *See, e.g.*, *PPL Montana*, -- U.S. at --, 132 S.Ct. at 1128-29 (summarizing cases addressing the judicial test for

navigability and how it is applied in different contexts).

In the CWA, by contrast, the term "navigable waters" is defined as "the waters of the United States, including the territorial seas."  33 U.S.C. § 1362(7).  In turn, the Agencies have each adopted rules that define "waters of the United States," which are codified at 33 C.F.R. § 328.3(a) (Corps' definition) and 40 C.F.R. § 232.2 (EPA's definition).[3]

The Corps' definition of "the waters of the United States" includes "[a]ll waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide."  33 C.F.R. § 328.3(a)(1). But the regulations go on to define "waters of the United States" to include virtually every other type of water body imaginable, as well as the tributaries of such waters.  33 C.F.R. § 328.3(a)(2)-(5).[4]  Before the limitations imposed by *Rapanos*, this definition was used to extend CWA jurisdictional to drainage features many miles from a watercourse that is actually

---

[3] The Agencies' regulatory definitions are identical.  For convenience, Home Builders will cite to the Corps' rules.

[4] For example, 33 C.F.R. § 328.3(a)(3) provides that "waters of the United States" includes "[a]ll other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce," including any of such waters "[w]hich are or could be used by interstate or foreign travelers for recreation or other purposes."

navigable in the traditional sense. *See Rapanos,* 547 U.S. at 726-27 (describing the Corps' "sweeping assertions of jurisdiction over ephemeral channels and drains as 'tributaries'") (plurality opinion); *id.* at 781 (the Corps' standard for tributaries "leave[s] wide room for regulation of drains, ditches, and streams remote from any navigable-in-fact water and carrying only minor water volumes towards it") (Kennedy, J., concurring in the judgment).

A majority of the justices in *Rapanos* rejected the Corps' "essentially boundless" interpretation of the phrase "waters of the United States." *Id.* at 758 (Roberts, C. J., concurring). Under the plurality's test, a tributary must be "a relatively permanent body of water connected to traditional interstate navigable waters" to be subject to regulation under the CWA. *Id.* at 742. Justice Kennedy, concurring in the judgment, instead indicated that a tributary must have a "significant nexus with navigable-in-fact waters" to be subject to regulation. *Id.* at 784-85. These judicial tests altered the regulatory landscape and made the identification of the nearest traditional navigable water critical in determining CWA jurisdiction.

The Agencies were well aware of this sea change, as shown by a guidance document they issued in late 2008, a few weeks before EPA's navigability decision in this case. *Clean Water Act Jurisdiction Following*

11

*the U.S. Supreme Court's Decision in* <u>Rapanos v. United States</u> & <u>Carabell</u> <u>v. United States</u> (Dec. 2, 2008) ("Rapanos Guidance").[5]  According to this document, the basis for CWA jurisdiction is now the relationship between the subject water feature and the nearest traditional navigable water, or "TNW."  Water features that are direct tributaries to TNWs are categorically jurisdictional, while other water features are subject to regulation only if they have a significant nexus with a TNW.  Rapanos Guidance, at 1. "Principal considerations when evaluating significant nexus include the volume, duration, and frequency of the flow of water in the tributary and the proximity of the tributary to a traditional navigable water."  *Id.* at 10.  The guidance also states that in arid areas, Justice Kennedy's significant-nexus test will be used to assert jurisdiction over ephemeral tributaries.  *Id.* at 12.[6]

---

[5] The Rapanos Guidance is available at http://www.usace.army.mil/ Missions/CivilWorks/RegulatoryProgramandPermits/RelatedResources/ CWAGuidance.aspx (visited Jan. 23, 2014).

[6] There are other post-*Rapanos* documents in which the Corps has explained that a tributary's proximity and relationship to a TNW are now used to determine if the tributary is subject to regulation.  For example, the Corps' instructional guidance on jurisdictional determinations provides:

> A significant nexus exists if the tributary, in combination with all of its adjacent wetlands, has more than a speculative or an insubstantial effect on the chemical, physical, and/or biological, integrity of a TNW.  Principal considerations when evaluating significant nexus include the volume, duration, and frequency of the flow of water in the tributary and the proximity of the tributary to a TNW . . . .

Consequently, after *Rapanos*, whether desert washes[7] and other drainage features in the Southwest are subject to regulation as "waters of the United States" is based on their proximity and relationship to the closest traditionally navigable water body. Well aware of the jurisdictional limitations imposed by *Rapanos*, the Agencies deliberately classified portions of the Santa Cruz River as traditional navigable waters for the specific purpose of asserting jurisdiction over drainage features in the watershed, thereby subjecting Home Builders' members to increased regulation under the CWA that was previously not possible under *Rapanos*.

## III.    HOW NAVIGABILITY DETERMINATIONS DIFFER FROM JURISDICTIONAL DETERMINATIONS.

The manner in which the phrase "jurisdictional determination" is used in certain agency documents creates confusion by referring to both determinations of a water body's navigability – a judicial test – and site-specific determinations of whether washes on a particular parcel of land are "waters of the United States" subject to CWA regulation. A decision

---

U.S. Army Corps of Engineers, Jurisdictional Determination Form Instructional Guidebook 7 (May 30, 2007*), available at* http://www.usace.army.mil/Portals/2/docs/civilworks/regulatory/cwa_guide/ jd_guidebook_051207final.pdf (visited Jan. 23, 2013).

[7] "Wash" refers to a drainage feature that is normally dry and flows only in response to local precipitation. Examples of typical washes in the Tucson area are found in the Appendix at pages 278-286, 317-325, and 351-357.

classifying a water body as navigable under *The Daniel Ball* test differs significantly from a site-specific jurisdictional determination, or "JD."

The Corps issues JDs in response to a request from a landowner, permit applicant, or other affected party. An "approved JD" is "a Corps document stating the presence or absence of waters of the United States *on a parcel* or a written statement and map identifying the limits of waters of the United States *on a parcel*." 33 C.F.R. § 331.2 (definition of "approved jurisdiction determination") (emphasis added); *see also Regulatory Guidance Letter No. 08-02*, *Jurisdictional Determinations* 1 (June 28, 2008) ("An approved JD is an official Corps determination that jurisdictional 'waters of the United States' . . . are either present or absent *on a particular site*." (emphasis added)) ("RGL 08-02") (reproduced in Addendum).[8] Thus, a JD applies only to a particular parcel and may be issued only to an "affected party," i.e., "an individual who has an identifiable interest in the property." 33 C.F.R. § 331.2. With the Corps' issuance of a JD comes a right to appeal. *See* 33 C.F.R. § 320.1(a)(2); 33 C.F.R. pt. 331. Under these regulations, affected parties must receive written notice of an approved JD, including a notice of appeal fact sheet, a request for appeal form, and the basis for the jurisdictional determination. 33 C.F.R. § 331.4.

---

[8] RGL 08-02 is available at http://www.usace.army.mil/Portals/2/docs/ civilworks/RGLS/rgl08-02.pdf (visited Feb. 21, 2014).

The Corps is also authorized to issue non-appealable "preliminary JDs," which, while technically advisory, are used by the Corps to implement CWA Section 404, including enforcement (e.g., cease and desist letters) and permit issuance. RGL 08-02 at 1, 3.[9] Like approved JDs, preliminary JDs are site-specific determinations that apply to a parcel of land. *See* 33 C.F.R. § 331.2 (definition of "preliminary jurisdiction determination").

In contrast, the Agencies' TNW Determination for the Santa Cruz River applies to two river reaches that extend more than 50 miles and affects all tributaries of those reaches and all land over which these tributaries pass – a vast area that includes much of the Tucson metropolitan area. It was neither requested by nor issued to an affected party in accordance with the Corps' regulations, but instead was initiated and issued unilaterally, out of the public eye and with no public involvement. And the Agencies made no attempt to comply with the administrative appeals process for site-specific JDs. APP019-024. Instead, as shown below, the TNW Determination was issued for the purpose of expanding the Agencies' regulatory jurisdiction to pre-*Rapanos* levels.

---

[9] For example, a "landowner, permit applicant, or other 'affected party' may elect to use a preliminary JD to voluntarily waive or set aside questions regarding . . . jurisdiction over a particular site, usually in the interest of allowing the landowner or other 'affected party' to move ahead expeditiously to obtain a Corps permit authorization where the party determines that is in his or her best interest to do so." *Id.* at 3.

## STATEMENT OF FACTS

**I.    THE AGENCIES' TNW DETERMINATION.**

**A.    The Santa Cruz River and Study Reaches A and B.**

The Santa Cruz River has its headwaters in southern Arizona and flows south a short distance into Mexico before reentering the United States approximately six miles east of Nogales, Arizona.  APP016.  The river then flows north past Tubac, Green Valley, and through the City of Tucson and the Town of Marana into southern Pinal County, where the river becomes a series of indistinct, non-continuous channels.  APP016; *see also* APP010-115.  From the 1800s to the present day, the Santa Cruz River has been a discontinuous stream, normally flowing only in response to significant rainfall or discharges of effluent from regional wastewater treatment plants.  APP017

The two reaches of the river that have been declared TNWs are called "Study Reach A" and "Study Reach B."  Study Reach A begins near Tubac, Arizona, and ends at the USGS gage station near Continental, south of Tucson, which is a distance of some 20 miles.  APP017.  Study Reach B begins at the discharge outlet of Pima County's Roger Road wastewater treatment plant in Tucson, and ends at the Pima County-Pinal County border in Arizona, a distance of more than 30 miles.  APP017.

## B.    The Agencies' Decision-making Process.

On May 23, 2008 – about two years after *Rapanos* was issued – Colonel Thomas H. Magness, the Commander of the Corps' Los Angeles District, issued a decision declaring that Study Reaches A and B are navigable-in-fact waterways under the traditional test for navigability. APP019, 031-036.  Specifically, Colonel Magness determined:

> Public access points within of [sic] the Study Reaches such as low river banks, bridges, and trail systems, together with their physical characteristics, such as frequency, duration, and permanency of flow, indicate that the Study Reaches have the potential to be used for commercial recreational navigation activities, such as canoeing, kayaking, birding, nature and wildlife viewing.  Such attractions and activities demonstrate that the Study Reaches may be susceptible to use in interstate commerce. Collectively, the above factors demonstrate that the Study Reaches are navigable-in-fact, and thus a TNW, susceptible to use in interstate commerce with recreational navigation activities.

APP035-036.  This decision was not associated with a JD for a particular parcel of land or a permit application by a landowner.  APP019.  The Corps gave no notice to any landowners within the Santa Cruz River watershed, and landowners had no opportunity to submit evidence and comments regarding the river's navigability.  APP003, 024.

17

Corps Headquarters suspended Colonel Magness' decision to conduct a review of his findings. APP020. During this period, Colonel Magness and his staff stressed to Corps Headquarters the importance of classifying Study Reaches A and B as TNWs in asserting jurisdiction over tributaries within the Santa Cruz River watershed under the requirements imposed by *Rapanos*: "[W]ithout this TNW, the closest TNW may be the Colorado River, several hundred miles away. Using the [Colorado River] as a basis for JDs would likely mean that we would lose most of our jurisdiction in the state." APP020. Another Corps staff member explained: "If these reaches are not TNWs, there would be a profound effect on our ability to regulate tributaries to the Santa Cruz River. While the Santa Cruz would still likely be an RPW [relatively permanent water], the nearest TNW to the 8,600 square mile Santa Cruz River Watershed Basin would be 300 river miles away (the Colorado River) from the Pima County line." APP020.

On August 17, 2008, before the completion of the Corps' internal review, EPA Headquarters declared that the Santa Cruz River's status as a navigable-in-fact waterway is a "special case" under a long-standing agreement between the Agencies that authorizes the EPA to make final

jurisdictional determinations. APP021.[10] Under this agreement, EPA's determinations are "binding on the Government" and "represent the Government's position in any subsequent Federal action or litigation regarding the case." APP021; Addendum at 10, 14.

On December 3, 2008, Benjamin H. Grumbles, EPA's Assistant Administrator for Water, issued EPA's "special case" decision affirming the classification of Study Reaches A and B as TNWs. APP002, 022, 108-109. Mr. Grumbles further instructed EPA Region 9 and the Corps to immediately implement the decision "to complete pending and future [JDs] in the Santa Cruz River watershed." APP022, 108-109.

Consequently, the Agencies are bound by and have relied on the TNW Determination in making permitting and enforcement decisions under the CWA in the Santa Cruz River watershed. APP006, 023.

## II. THE ADVERSE IMPACTS OF THE TNW DETERMINATION ON HOME BUILDERS' MEMBERS.

Home Builders' members own and use land within the Santa Cruz River watershed in connection with home building and other land

---

[10] *Memorandum of Agreement Concerning the Determination of the Geographic Jurisdiction of the Section 404 Program and the Application of the Exemptions under Section 404(f) of the CWA* (Rev. Jan. 1993) ("Geographic Jurisdiction Memorandum") (copy reproduced in Addendum), *available at* http://www.usace.army.mil/Portals/2/docs/civilworks/mous/ 404f2.pdf (visited Mar. 9, 2014).

development activities.    APP006.    Home Builders' members regularly construct streets and roads, install utility lines and related improvements, and grade and improve lots and other parcels of private land.  APP010-011. Often, these activities cannot be conducted without impacting desert washes and other drainage features, which are found throughout the Santa Cruz River watershed.  APP010-011; *see also* APP138, 225.  As explained above, if those washes are tributary to Study Reach A or B, they are now subject to regulation as a "water of the United States" under the *Rapanos* significant-nexus test.

The regulatory significance of the TNW Determination is illustrated by the Corps' Approved Jurisdictional Delineation Form ("JD Form") (copy reproduced in Addendum).  The form requires landowners to identify "the nearest Traditional Navigable Water (TNW) into which the aquatic resource flows," and defines "waters of the United States" as including "non-RPWs that flow directly or indirectly into TNWs."  JD Form at 1, §§ I(C), II(1)(a).[11]  Consistent with *Rapanos* and the Agencies' Rapanos Guidance, CWA jurisdiction is now based on the proximity of a wash to a TNW and

---

[11] An RPW is an acronym for "relatively permanent water," which is based on the *Rapanos* plurality test for CWA jurisdiction.  547 U.S. at 742.  Thus, a "non-RPW" would be a wash or other drainage feature with ephemeral or intermittent flows.

the hydrological relationship between that wash and the TNW.  *Id.*, §§ III(C).

As Colonel Magness and his staff explained to Corps Headquarters, before the TNW Determination was issued, the nearest navigable waterway was the Colorado River, located some 300 miles from the Tucson area. APP020.   To regulate desert washes and other drainage features on members' land after *Rapanos*, the Agencies were required to show that a wash crossing an NAHB member's land had a significant nexus to the Colorado River – an essentially impossible finding.   The Agencies deliberately filled this jurisdictional gap by unilaterally declaring portions of the Santa Cruz River to be TNWs.  APP016-017, 020, 112-115.

Obviously, the greater the distance between a desert wash and a TNW, the more difficult it becomes to establish a significant nexus. Likewise, the closer a wash is to a TNW, the easier it becomes to establish that relationship.  For NAHB's members who own and are developing property in the Santa Cruz River watershed, therefore, the Agencies' decision to declare more than 50 miles of the Santa Cruz River to be navigable has dramatically changed how their properties are regulated.  As shown by the declarations of Messrs. DeGrazia, Kreis, and LeCocq, the

Agencies' TNW Determination has increased the likelihood of regulation to a near certainty. Their declarations are summarized below.

### A.  Jerry DeGrazia.

Jerry DeGrazia is the owner and manager of The J. DeGrazia Company, L.L.C. He is a member of NAHB and SAHBA. Through his company, he purchases and develops property for resale in southern Arizona. APP223-224. Mr. DeGrazia discussed four properties that he is developing in northeast Tucson, within the Santa Cruz River watershed. These properties contain desert washes and other drainage features that are tributary to the Santa Cruz River. They are located within 20 miles of the Santa Cruz River. APP229, 232, 233, 235. Before the TNW Determination, the nearest TNW to those properties was the Colorado River, located more than 300 miles west of Tucson. APP227.

Mr. DeGrazia explained that his development activities will require the discharge of fill material into desert washes that have been determined to be or are almost certainly jurisdictional as a result of the TNW Determination. APP229-236. As a result, Mr. DeGrazia has incurred substantial costs and regulatory burdens, including jurisdictional analyses of his properties based on the TNW Determination and modifying development plans for his properties to avoid impacts on washes because of their

relationship to the Santa Cruz River. APP228-230, 232-236. In addition, Mr. DeGrazia explained how he has been injured by the lack of any public notice and comment process relating to the TNW Determination, how the adverse effects from the TNW Determination for his properties are continuing, and how a decision vacating the TNW Determination would remedy the adverse effects of the TNW Determination on his properties. APP236-237.

### B.     Larry Kreis.

Larry Kreis is the General Manager of Red Point Development, Inc. Red Point is a member of NAHB and SAHBA, and has been developing residential and commercial properties in southern Arizona since 2004. Red Point currently owns and is developing six properties – Cascada, De Anza, Oasis Hills III, Talavera, Silver Meadows, and Copper Point – located within the Santa Cruz River watershed. APP142-153.

Mr. Kreis discussed each of Red Point's properties and the washes that cross them. He explained that Red Point intends to discharge fill materials into certain of these drainages to develop and improve its properties. Notably, all of Red Point's properties are located within two to four miles of the Santa Cruz River, and drainages crossing its properties are considered to be tributaries of the river. Before the adoption of the TNW

Rule, the nearest TNW was the Colorado River, located some 300 miles west of Tucson.  APP141.

Mr. Kreis explained that the classification of the Santa Cruz River as a navigable waterway entirely changed the manner in which Red Point's properties are regulated under the CWA, imposing regulatory burdens and substantial costs from permitting, consultants, mitigation fees, and the re-design of certain projects to avoid impacts on washes considered to be jurisdictional.  APP145, 147, 148-149, 150-152, 153-154.  Mr. Kreis also explained how Red Point has been injured by the lack of any public notice and comment process relating to the TNW Determination and how a decision vacating the TNW Determination would remedy the adverse effects on Red Point's properties.  APP154-155.

### C.    Albert LeCocq.

Albert LeCocq is the President of LeCocq Construction Company, which is a member of NAHB and SAHBA.  Mr. LeCocq specializes in the construction of custom homes in southern Arizona.  Mr. LeCocq, through his company, owns a parcel of land in Marana on which he intends to construct a custom home.  This parcel is 10 miles east of the Santa Cruz River.  APP116-117.  By contrast, the Colorado River – previously the nearest TNW – is nearly 300 miles from this property.  APP121-122.

Mr. LeCocq explained that his property contains a large desert wash, which is a tributary of the Santa Cruz River.  He also explained that his construction activities are likely to discharge materials into the wash. Consequently, he will have to retain consultants – at a substantial cost – to evaluate whether that desert wash is a "water of the United States" based on its proximity and relationship to the Santa Cruz River.  APP120-124.  The proximity of Mr. LeCocq's property to the Santa Cruz River means that he faces a much greater likelihood that his property will be regulated under the CWA.  APP122-123.

Like Mr. DeGrazia and Mr. Kreis, Mr. LeCocq also explained how he has been injured by the lack of any public notice and comment process relating to the TNW Determination, and how a decision vacating the TNW Determination would remedy the adverse effects on his property.  APP123-124.

## <u>SUMMARY OF THE ARGUMENT</u>

In their TNW Determination, EPA and the Corps declared that 50 miles of the Santa Cruz River are navigable-in-fact and, therefore, traditional navigable waters.  As Corps officials stated, the TNW Determination was promulgated to ensure that the Corps (and EPA) could assert jurisdiction over desert washes and other drainage features that are tributary to the Santa

Cruz River under Justice Kennedy's significant-nexus test, including land owned and used by Home Builders' members.

The designation of two Santa Cruz River stretches as navigable-in-fact waterways changed the entire CWA regulatory framework in southern Arizona. Before the Agencies' TNW Determination, Home Builders could reasonably expect little to no regulation based on the *Rapanos* decision. As the Corps itself acknowledged, before the TNW Determination, the nearest navigable waterway was some 300 miles from the Tucson area, making it highly unlikely that the property of Home Builders' members would be subject to regulation.

After the TNW Determination, however, the situation changed completely. It is apparent that the Agencies strategically handpicked portions of the river designed to expand the Agencies' jurisdictional reach. By locating the TNW Determinations where they did, the Agencies ensured their ability to regulate the exact kind of dry ditch, culvert, or arroyo present on Home Builders' properties. *See Rapanos*, 547 U.S. at 725-28 (plurality opinion). In short, the Agencies have done an end run around *Rapanos* and are engaging in the same regulatory overreaching that the Supreme Court criticized in that decision.

The district court dismissed Home Builders' challenges to the TNW

26

Determination for lack of Article III standing.  However, the district court overlooked the procedural and substantive injuries that Home Builders and their members have suffered as a result of the Agencies' violations of the APA and their erroneous TNW Determination.  As shown by Home Builders' complaint (APP001-115) and the declarations submitted in opposing the motion to dismiss (APP116-419), the TNW Determination directly and adversely affects the use of real property, investment decisions, and project development choices of Home Builders' members, who own and use land within the Santa Cruz River watershed.

Given Home Builders' status as representatives of the regulated community and their members' ownership of land in the Santa Cruz River watershed that is subject to regulation, they are injured by and have standing to challenge the TNW Determination.  *See, e.g.*, *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1286-87 (D.C. Cir. 2005) ("*NAHB I*") (Home Builders have standing to facially challenge Corps' nationwide permits as representatives of the regulated parties).

The district court also held, in the alternative, that the Corps' decision was not final, relying principally on a distinguishable Ninth Circuit decision that addressed a site-specific JD for a parcel of land owned by an Alaskan borough, and several older district court cases that involved enforcement

27

disputes with landowners. The TNW Determination sets forth the Agencies' settled position regarding the navigability of more than 50 miles of the Santa Cruz River. This determination was made initially by the Corps' District Engineer under 33 C.F.R. § 320.1(a)(6), which authorizes district engineers to issue "formal determinations" on which the public can rely as final agency action. It was then reviewed and affirmed by EPA Headquarters as a "special case" – which is binding on the federal government – and EPA's Assistant Secretary for Water directed "EPA Region 9 to begin immediately to implement this decision" "to complete pending and future jurisdictional determinations for the Santa Cruz River watershed." APP109.

In short, the TNW Determination established a substantive standard, is binding on the Agencies, and must be used by the Agencies (as well as the State of Arizona) in administering and enforcing the CWA. Furthermore, the TNW Determination impacts the rights and obligations of the regulated community. Consequently, it constitutes final agency action and is reviewable under the APA.

## ARGUMENT

## I.     STANDARD OF REVIEW.

This Court reviews a district court's decision to grant or deny a motion to dismiss for lack of subject matter jurisdiction *de novo*. *El Paso*

28

*Natural Gas Co. v. United States*, 632 F.3d 1272, 1276 (D.C. Cir. 2011)

(citing *Nat'l Air Traffic Controllers Ass'n v. Fed Serv. Impasses Panel*, 606

F.3d 780, 786 (D.C. Cir. 2010)).  The Court should accept as true all facts

alleged by the nonmoving party and should draw all inferences in favor of

the nonmoving party.  *The Center for Law and Educ. v. Dep't of Educ.*, 396

F.3d 1152, 1156 (D.C. Cir. 2005).

## II.     THE DISTRICT COURT IMPROPERLY DISMISSED HOME BUILDERS' CLAIMS FOR LACK OF STANDING.

### A.     The Elements of Article III Standing.

Home Builders brought suit on behalf of their members challenging

the TNW Determination on both procedural and substantive grounds.  To

establish representational standing to sue on behalf of its members, an

association must allege that (a) an individual member would have standing

to sue on his own, (b) the interests at issue are germane to the association's

purpose, and (c) no individual member needs to participate to prosecute the

claim.  *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343

(1977).  There is no dispute that Home Builders satisfy the final two

elements of the *Hunt* test.  Home Builders seek to protect an interest

germane to their collective purpose as associations.  APP007-010.  They also

raised a facial challenge to the lawfulness of an agency action and seek a

declaration concerning its validity, which does not require participation of

any individual association member.  APP014-015, 026.

Consequently, Home Builders are required to show that at least one member has suffered an "injury in fact" that is "fairly . . . trace[able] to the challenged action of the defendant," and show it is "likely, as opposed to merely speculative, that [their] injury will be redressed by a favorable decision."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotations omitted); *see also Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc).  Standing is normally not an issue, however, when the plaintiff is challenging an agency action that regulates the plaintiff's conduct, as this Court has explained:

> [I]f the complainant is "an object of the action (or forgone action) at issue" – as is the case usually in review of a rulemaking and nearly always in review of an adjudication – there should be "little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it."

*Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002) (quoting *Defenders of Wildlife*, 504 U.S. at 561-62); *see also NAHB I*, 417 F.3d at 1286-87 ("We think it is fairly 'self-evident' that the various appellants as representatives of the regulated community satisfy the 'irreducible constitutional minimum' of Article III standing . . . .") (quoting *Defenders of Wildlife*, 504 U.S. at 560).

In this case, there is no dispute that Home Builders' members, who own and develop land in the Santa Cruz River watershed and are regulated under the CWA, were targets of the Agencies' rulemaking. APP008-010, 019-022. Indeed, whether the Agencies can unilaterally declare, without notice to the regulated community, that water bodies are navigable-in-fact for the purpose of asserting jurisdiction over remote tributaries is itself an issue of exceptional importance in light of *Rapanos*. *See Elec. Power Supply Ass'n v. FERC*, 391 F.3d 1255, 1262 (D.C. Cir. 2004) (associations representing regular participants in FERC hearings had a right to fair decision-making, providing standing to challenge agency procedural regulations). Home Builders' interest in the CWA's administration, together with their members' ownership of land that is subject to regulation, are sufficient for standing purposes.

### B.    The District Court Used an Incorrect Legal Standard to Evaluate Home Builders' Standing.

The district court, however, held that Home Builders have not adequately alleged that any of its members have suffered an injury-in-fact fairly traceable to the challenged regulation, asserting that the "allegations in the 2013 complaint are not substantially different from those in its 2009 complaint, and the factual circumstances have not changed at all." APP427. This is simply incorrect. The 2013 complaint contains additional and more

detailed allegations addressing how Home Builders' members are injured. *See, e.g.*, APP005, 006, 010-013.    It also includes additional details regarding the Agencies' decision-making process, which show that the TNW Determination was adopted for the express purpose of extending CWA jurisdiction to tributaries in the watershed.  APP019-021.  These allegations are supported by the declarations of Messrs. DeGrazia, Kreis, and LeCocq – association members who own and are developing land in the watershed. The declarations show how the use and development of these members' properties are adversely affected by the TNW Determination, focusing on events that have occurred since Home Builders' first suit was filed.

At the pleading stage of a case, the court must accept the plaintiff's general allegations of injury as true and construe the complaint in favor of the plaintiff.  *See, e.g.*, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 (1998) ("This case is on appeal from a Rule 12(b) motion to dismiss on the pleadings, so we must presume that the general allegations in the complaint encompass the specific facts necessary to support those allegations."); *Defenders of Wildlife*, 504 U.S. at 561 (same); *Warth v. Seldin*, 422 U.S. 490, 501 (1975) (same).  In addition, a court must assume that Home Builders will ultimately prevail on their claims against the agencies.  *See, e.g.*, *Defenders of Wildlife v. Gutierrez*, 532 F.3d 913, 924

(D.C. Cir. 2008) ("[I]n reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims.") (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003)).

The district court ignored these basic precepts and effectively treated the Agencies' motion to dismiss as if it were a motion for summary judgment, and then construed the facts against the non-moving party. The district court also mischaracterized and marginalized the declarations of individual Home Builders members – which were *not* submitted in the prior case – concluding that "the factual circumstances have not changed at all" since Home Builders' first lawsuit was filed in 2009. APP427. In fact, Home Builders' declarations describe events occurring since that time, including Corps approval of project-specific JDs based on the TNW Determination.

This Court's precedents require far less – only an "identifiable trifle" is necessary to satisfy the injury-in-fact requirement. *Action Alliance of Senior Citizens of Greater Phila. v. Heckler*, 789 F.2d 931, 937 (D.C. Cir. 1986) (quoting *United States v. Students Challenging Regulatory Agency Procedures,* 412 U.S. 669, 689 n.14 (1973)) (a plaintiff's injury "need not be

large or intense; an 'identifiable trifle' . . . is sufficient to meet the constitutional minimum"); *Pub. Citizen v. Lockheed Aircraft Corp.*, 565 F.2d 708, 714 (D.C. Cir. 1977) ("An 'injury in fact' need not be substantial to support federal court jurisdiction over [a] challenge to agency action; an identifiable trifle will suffice.").  Home Builders have shown far more than an identifiable trifle at a stage in the litigation when Home Builders' burden is at its lowest. *See Rapanos*, 547 U.S. at 721 ("The burden of federal regulation on those who would deposit fill material in locations denominated 'waters of the United States' is not trivial.") (plurality opinion).

> **C.  The Regulated Community Normally Has Standing to Bring Facial Challenges to Agency Rules That Regulate Their Members' Activities.**

Home Builders have raised a facial challenge to the Agencies' regulation as representatives of the regulated community.  The district court's ruling suggests that trade associations are prohibited from bringing facial challenges to agency rules – a dramatic departure from this Court's precedent, *see, e.g.*, *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 440 F.3d 459, 461-62 (D.C. Cir. 2006) ("*NAHB II*") (facial challenge to Corps' rule defining "discharge of dredged material"); *NAHB I*, 417 F.3d 1272 (facial challenges to Corps' nationwide permits); *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399 (D.C. Cir. 1998)

(facial challenge to Corps' rule expanding the definition of "discharge"), as well as Supreme Court precedent. *See, e.g.*, *Babbitt v. Sweet Home Chap. of Communities for a Greater Or.*, 515 U.S. 687 (1995) (facial challenge to an agency rule promulgated by the Fish and Wildlife Service regulating habitat modification).

Even in a facial challenge, a party's standing is "self-evident" if the party is challenging an action that "regulates the disposition" of that party's property. *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 734 (D.C. Cir. 2003). Home Builders, on behalf of their members, are challenging an action that regulates the use of their property.

In *Fund for Animals*, the Country of Mongolia sought to intervene in litigation against the Secretary of the Interior and the Fish and Wildlife Service. 322 F.3d at 730. Environmental groups had sued the government alleging that it violated the APA and Endangered Species Act "by failing to list the argali [sheep] as an endangered species in Mongolia, Kyrgyzstan, and Tajikistan, and by issuing hundreds of permits for sport hunters to import killed argali (or parts thereof) into the United States as 'trophies.'" *Id.* In evaluating Mongolia's motion to intervene – which required a showing that it had standing – this Court found that "[t]he threatened loss of tourist dollars, and the consequent reduction in funding for Mongolia's

conservation program, constitute a concrete and imminent injury." *Id.* at 731. This threat to Mongolia's property was an injury-in-fact conferring standing to intervene. *Id.* at 734 ("[W]e see no meaningful distinction between a regulation that directly regulates a party and one that directly regulates the disposition of a party's property.")

Here, Home Builders sued the Agencies because they have already been harmed by the Agencies' regulation. The TNW Determination directly impacts members' properties and imposes obligations on Home Builders' members that would not exist but for the TNW Determination. Moreover, the Agencies' action was intended to regulate land development and construction activities – the very businesses in which Home Builders' members are engaged. As Colonel Mangess candidly stated, "without this TNW, the closest TNW may be the Colorado River, several hundred miles away. Using the [Colorado River] as a basis for JDs would likely mean that we would lose most of our jurisdiction in the state." APP020.

Although Home Builders' members were targets of the Agencies' regulatory action, the district court erroneously assumed that additional project costs and delays, as well as reductions in property values, resulting from the regulation of private property are not legitimate injuries. For example, the district court explained that Home Builders' declarants failed to

36

allege that they "have been denied a permit or received a permit with undesirable conditions attached." APP427. The district court also found that costs associated with hiring consultants to determine whether washes that cross private land, which are now subject to regulation, are "self-inflicted." APP430; *but see Rapanos*, 547 U.S. at 721 ("The average applicant for an individual [Section 404] permit spends 788 days and $271,596 in completing the process, and the average applicant for a nationwide permit spends 313 days and $28,915 – not counting costs of mitigation or design changes.") (plurality opinion); *NAHB I*, 417 F.3d at 1275-76, 1280 (describing the "individual-permit gauntlet" through which a landowner must pass under CWA Section 404).

The bottom line is that the regulation of private property by a federal agency, with its attendant costs and delays and its impact on property value, *is* a legitimate injury that supports standing. For example, this Court, in holding that Corps' nationwide permits are final agency action, explained: "Either way, through project delay or project modification, the [permits] directly affect the investment and project development choices of those whose activities are subject to the CWA. Indeed, the Corps itself appreciated that its permits would influence project design." *NAHB I*, 417 F.3d at 1280. While the Court was addressing the legal consequences of the

challenged permits in a different context, the impacts on land development recognized by this Court are present here and support standing.

>    **D.    The District Court Mischaracterized Home Builders' Declarations and the Injuries Their Members Suffered as a Result of the TNW Determination.**

The district court held that the declarations of Messrs. DeGrazia, Kreis and LeCocq are inadequate to support standing, erroneously asserting, for example, that none of the declarants "allege that the agencies have asserted CWA jurisdiction over any of their properties for the first time following the issuance of the TNW Determination," and ultimately concluding that their injuries are "self-inflicted" or too speculative to support standing.    APP427-432.    The district court badly misread these declarations, which describe specific properties that are subject to regulation based on their proximity to the Santa Cruz River.

Mr. DeGrazia, for example, obtained a site-specific JD from the Corps for his Sabino Canyon Property in 2009 and authorization from the Corps to discharge fill material in 2011.    APP229-232.    Initially, his consultant had identified one jurisdictional water, a small portion of Ventana Canyon Wash in the far northwestern corner of his property.    APP230, 269-274, 275-277.    However, the Corps identified five additional jurisdictional "waters" on his

property, each of which is a small desert wash.  APP230, 269-274, 275-277.

This required Mr. DeGrazia to modify his project and incur additional costs:

> I also designed the development in a manner that minimizes impacts on the *six jurisdictional washes the Corps identified on the property*.  The map attached as **Exhibit F** illustrates the project configuration in relation to those washes. . . . That project configuration, which attempts to avoid "waters of the United States" to the extent practicable, has increased project costs and impacted the manner in which the property can be used, affecting its value.

APP231-232 (italics added).  Furthermore, The Corps' authorization required Mr. DeGrazia to comply with the terms and conditions of "Nationwide Permit No. 29, 'Residential Development,'" as well as 10 "special conditions" governing his land use.  APP269-274.  This assertion of jurisdiction occurred after EPA Headquarters affirmed the TNW Determination in December 2008.

Mr. DeGrazia also explained how the TNW Determination allowed the Corps to assert jurisdiction over these washes:

> Th[e] photographs [attached at Exhibit E] also demonstrate the impact of the agencies' decisions on my properties.  It would seem extremely difficult, if not impossible, to demonstrate a significant hydrological relationship between the desert washes on the Sabino Canyon Property and the Colorado River, some 300 river miles away . . .

> Absent the classification of Study Reach B as a navigable waterway, I would have been able to demonstrate, for example, the lack of any significant hydrological nexus from "jurisdictional wash C" (drainage feature C on **Exhibit D** and Photo Point #7 in **Exhibit E**) to the Colorado River. The likelihood of stormwater runoff transported by this desert wash actually reaching the Colorado River some 300 miles away is at best very unlikely.

APP231.

Because of the TNW Determination, Mr. DeGrazia was precluded from asserting that the Colorado River was the nearest TNW – a right he had before the determination. And as a "special case" that is binding on the government, Corps staff must now regard the Santa Cruz River as a TNW.

Mr. DeGrazia provided details on other properties he is developing, and described project costs he incurred after the TNW Determination was issued. He retained a consulting firm to investigate whether there are any jurisdictional washes on the Harrison Property in 2009 (the consultant determined there are three, but the Corps added an additional wash). APP232-233. He also retained a consulting firm to investigate the Bonanza property in 2009. APP233-234. As it had to, the consultant's report, issued in 2010, cited the Corps' May 2008 decision as the basis for using the Santa Cruz River as the nearest TNW. APP233-234. Again, the Corps

40

subsequently identified additional desert washes subject to CWA regulation. APP234.[12]

The district court rejected these assertions of jurisdiction over washes that are tributary to Study Reach B, as well as the injuries described in Mr. Grazia's declaration, explaining that the JDs prepared by his consultants were "private studies that DeGrazia commissioned" and suggesting that they were unnecessary. APP431. Unfortunately, site evaluations by experienced consultants *are* necessary due to the complexity of determining whether a drainage feature is a "water of the United States." As noted by the Supreme Court, "the definitions used to make jurisdictional determinations are deliberately left vague." *Rapanos*, 547 U.S. at 727 (quoting U.S. Government Accounting Office, *Corps of Engineers Needs to Evaluate Its District Office Practices in Determining Jurisdiction*, GAO-04-297, p. 26 (2004)[13]) (quotation marks omitted) (plurality opinion). Determining whether drainage features are jurisdictional "waters" in the desert is

---

[12] The district court attempted to marginalize these site-specific JDs as being "preliminary." APP428. As previously explained, however, a landowner may elect to use a preliminary JD to obtain an individual permit or nationwide permit authorization, just as Mr. DeGrazia did for his Sabino Canyon Property. *See also* RGL No. 08-02. They are hardly meaningless documents, as the court's reasoning suggests, given that they are the basis for CWA permitting decisions.

[13] Report available at http://www.gao.gov/products/GAO-04-297 (visited Feb. 25, 2014).

particularly difficult, given the absence of water and, in many cases, clearly

defined banks, as illustrated by the exhibits to Mr. DeGrazia's declaration,

which include photographs of "waters" regulated by the Corps.  APP278-

286, 317-325, 351-357.

Furthermore, the Corps encourages landowners to hire consultants to

perform JDs, which are then submitted to and approved by Corps staff, as in

Mr. DeGrazia's case.   For example, the Corps' San Francisco District

website advises the public:

> The Corps of Engineers receives thousands of
> requests each year to perform wetland delineations
> for potential applicants for permits under Section
> 404 of the Clean Water Act.  Due to limited staff
> and resources, response time can be several
> months or longer.  To expedite this process, the
> San Francisco District *encourages applicants to
> use consultants to conduct wetland delineations*,
> especially for large and/or complex areas.

U.S. Army Corps of Engineers, San Francisco District, *Wetland Deline-*

*ations and Jurisdictional Determinations*, http://www.spn.usace.army.mil/

Missions/Regulatory/JurisdictionDeterminations.aspx (visited Feb. 26,

2014) (emphasis added).  Likewise, the Corps' Philadelphia District website

states:

> The JD process provides important information to
> a landowner or investor for planning purposes or
> carrying out certain activities on a given parcel of
> land.  Accurately identifying waters and wetlands

> is essential in making an application for a permit from the Corps to determine if work would occur in regulated waters of the United States. . . .
>
> In order to help further streamline the JD procedures, we encourage applicants to consider the use of consultants to perform the delineation.

U.S. Army Corps of Engineers, Philadelphia District, *Jurisdictional Determinations*, http://www.nap.usace.army.mil/Missions/Regulatory/ JurisdictionalDeterminations.aspx (visited Feb. 26, 2014).[14]

In Mr. DeGrazia's case, three of his consultants' reports had been submitted to the Corps at the time of his 2013 declaration; in each case the Corps issued a JD based on the report, but only after identifying additional washes as jurisdictional.   APP229-230, 232-233, 233-234.   Further, Mr. DeGrazia received the Corps' permission to discharge fill material at his Sabino Canyon property subject to conditions regulating his land use. APP230.   The district court concluded that because Mr. DeGrazia ultimately was issued a permit, he was not injured.   APP431-432.   In other words, the

---

[14] *See also, e.g.*, U.S. Army Corps of Engineers, New York District, *Jurisdictional       Determinations*,       http://www.nan.usace.army.mil/ Missions/Regulatory/ Jurisdictional Determinations.aspx (visited Feb. 26, 2014); U.S. Army Corps of Engineers, Savanna District, *Wetland Determinations*, http://www.sas. usace. army.mil/ Missions/Regulatory/ JurisdictionalDetermination/Wetland Delineations.aspx (visited Feb. 26, 2014); U.S. Army Corps of Engineers, Vicksburg District, *Jurisdictional Determinations*,       http://www.mvk.       usace.army.mil/Missions/Regulatory/ JurisdictionalDeterminations.aspx (visited Feb. 26, 2014).

district court concluded that the unauthorized and unnecessary regulation of private land by a federal agency is not an injury for standing purposes. *Contra, e.g., Cellco P'ship v. FCC*, 357 F.3d 88, 99-100 (D.C. Cir. 2004) (holding that Verizon had standing to challenge FCC failure to complete biennial reviews of regulations based on impact of "unnecessary" regulation). Clearly, this was erroneous.

Mr. Kreis and Red Point Development received similar treatment from the district court. Mr. Kreis identified six properties that Red Point is currently developing in the Tucson area which are adversely affected by the TNW Determination. The district court held that Mr. Kreis' declaration is insufficient to support standing on several erroneous grounds.

For example, the district court correctly stated that Red Point obtained a CWA permit for the Cascada Project in February 2008 – a process that took five years and cost more than $500,000. APP429. But Red Point is currently developing an additional 100 acres of land at Cascada, and filed an amended application for a CWA permit in October 2012. APP144-145. The district court disregarded these facts because the "application is still pending, and Kreis does not claim that the agencies have taken any action with respect to the Cascada property based on the TNW." APP429. This reasoning appears, again, to hinge on the district court's erroneous view that

the unauthorized regulation of private property is not an injury for standing

purposes.

In fact, Mr. Kreis explained that "[a]s a direct result of the TNW

Decisions, [Red Point's new permit] application is based on the proximity of

the Cascada Project to Study Reach B."  APP144.  He also explained how

the TNW Determination has injured Red Point by impacting how this

property is developed:

> There are a number of washes on the property added to the Cascada Project that discharge to the Santa Cruz River, [which are] are located less than two to three miles from Study Reach B.  Had Study Reach B not been classified as a TNW, we probably would have moved forward with development of the additional lands without filing an amended application because the minor, braided washes on the property would not have a significant nexus to the Colorado River or other TNW and were not in the flood plain. . . .
>
> Following the classification of Study Reach B as a TNW, however, the manner in which washes and other ephemeral drainage features are regulated changed.  The Corps (and EPA) is now using Study Reach B in deciding whether a wash has a significant nexus.  This means, in the case of Red Point's Cascada Project, that nearest navigable water body is only two or three miles away, as opposed to hundreds of miles away. . . .
>
> Thus, the TNW Decisions have had an immediate and substantial impact on how the CWA is administered and enforced in southern Arizona, adversely affecting our real estate development

> activities.  The presence of extensive jurisdictional washes – ephemeral drainages classified as "waters of the United States" – on the Cascada property directly affects the manner in which the property can be developed, including avoiding or minimizing impacts to the washes and mitigating for impacts caused by our development activities that are unavoidable.  These requirements reduce the developable area of our property, reducing its value, and result in project costs that would otherwise not be incurred.

APP144-145.

Mr. Kreis identified additional properties that Red Point is currently developing in the greater Tucson area and explained how they are adversely impacted by the TNW Determination.  All of these properties are located two to four miles from the Santa Cruz River and are crossed by washes and drainage features tributary to the river.  APP147-149, 149-150, 151-152, 152-153.  Mr. Kreis explained how the TNW Determination will affect project development choices, reduce land values, and force Red Point to incur additional costs.  But the district court found these impacts to be "possibilities only," insufficient to establish an injury-in-fact, citing *Defenders of Wildlife*, 504 U.S. at 560-61.  APP430.  This too was erroneous.

Red Point's injuries are directly related to property it owns and is currently developing, as Mr. Kreis discussed in detail in his declaration.

This case is nothing like *Defenders of Wildlife*, where the alleged injuries arose from projects in foreign countries, in locations the declarants had visited in the past and hoped to visit again in the future. 504 U.S. at 563-64. The Court stated: "Such 'some day' intentions – without any description of concrete plans, or indeed any specification of when the some day will be – do not support a finding of the 'actual or imminent' injury that our cases require." *Id.* at 564. Here, by contrast, Mr. Kreis described six different projects being developed within four miles of the Santa Cruz River and the adverse impacts caused by the Agencies' regulation.

Finally, the district court held that the declarations "fail to demonstrate a substantially increased risk of regulation" because the Agencies' counsel stated that the Agencies might not regard the Colorado River as the nearest TNW to the Santa Cruz River, and, in any case, the Agencies have discretion to examine a water body's navigability on a case-by-case basis. APP432.[15] Of course, this reasoning ignores the undisputed representations of Colonel Magness and his staff to Corps Headquarters and EPA's "special case" decision, which eliminated any discretion regarding the Santa Cruz River's legal status as a TNW. APP006, 020-022, 023.

---

[15] The alternative "nearest traditional navigable water" has yet to be disclosed by the Agencies. In any event, that argument is groundless because the TNW Determination is final and binding on the Agencies, as discussed in the concluding section of the Argument.

Given the Corps' own statements, the determination of EPA Headquarters, and the requirement that the court accept Home Builders' allegations of injury as true and construe the complaint in Home Builders' favor, the district court's holding that the TNW Determination had no regulatory impact on Home Builders' members was erroneous.

### E.    Home Builders Have Established Standing to Challenge the Agencies' Failure to Comply With the APA.

Home Builders allege that the TNW Rule constitutes a legislative rule that was adopted without observance of the APA's procedures for rulemaking, including public notice and an opportunity to submit evidence and comments, and therefore should be set aside.  *See* APP023-024. Congress adopted the APA to "assure that the administration of government through administrative officers and agencies shall be conducted according to established and published procedures which adequately protect the private interests involved," such as Home Builders and their members.  H.R. Rep. No. 1980, at 18 (1946).  These procedural requirements "improve[] the quality of agency rulemaking," ensure "fairness to affected parties," and give "affected parties an opportunity to develop evidence in the record to support their objections to a rule."  *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 547 (D.C. Cir. 1983).  The failure to provide public notice of the TNW Rule and allow public participation in the

rulemaking process deprived NAHB and its members of the opportunity to protect their interests. *See* APP014, 123-124, 154-155, 236-237.

The district court gave short shrift to the Home Builders' procedural injuries, holding that Home Builders lack standing because they failed to demonstrate "a specific, concrete injury fairly traceable to the TNW Determination," and assert "a procedural right *in vacuo*." APP433-434. This holding was erroneous for all the reasons discussed above.

The use of the phrase "*in vacuo*" in this context appears to have originated in *Summers v. Earth Island Institute*, where environmental organizations challenged Forest Service regulations that exempted certain timber-salvage projects from the notice, comment, and appeal process normally applicable to National Forest System projects. 555 U.S. 488, 490 (2009). After the district court granted a preliminary injunction, the parties entered into a settlement resolving the dispute over the application of the regulations to the Burnt Ridge Project. The district court then issued a nationwide injunction prohibiting use of the regulations. *Id.* at 491-92. The Ninth Circuit narrowed the scope of the injunction, but allowed it to remain in place as to the regulations that were specifically applicable to the Burnt Ridge Project. *Id.* at 492.

In reversing the lower courts and dismissing the case for lack of

standing, the Supreme Court explained that "[r]espondents have identified no . . . application of the invalidated regulations that threatens imminent and concrete harm to the interests of their members" other than the Burnt Ridge Project, which had been settled and therefore was "off the table" for standing purposes. *Id.* at 495, 497. The only other affidavit submitted by an organization member was insufficient "because it was not tied to application of the challenged regulations, because it does not identify any particular site, and because it relates to past injury rather than imminent future injury that is sought to be enjoined." *Id.* at 495. Accordingly, the Court held that the organizations lacked standing: "[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation – a procedural right *in vacuo* – is insufficient to create Article III standing." *Id.* at 496.

Here, in contrast, Home Builders have submitted declarations from members that *are* tied to the application of the TNW Determination to 11 specific projects in the Santa Cruz River watershed – which are concrete interests – and describe current and future injuries, including increased project costs, project delays, and decreases in property value. In addition, Messrs. Kreis, DeGrazia, and LeCocq explain how they have been harmed by the lack of any public notice-and-comment process relating to the TNW Determination, how they rely on Home Builders to represent their interests

50

in such proceedings, and how the procedural violations prevented them – through Home Builders – from exercising their procedural rights in relation to their property interests affected by the regulation.  APP123-124, 154-155, 236-237.  Therefore, Home Builders are not asserting a procedural injury *in vacuo*, and the district court's dismissal of Home Builders' challenge to the Agencies' APA violations on such grounds was erroneous.

In sum, the district court erred in dismissing Home Builders' complaint for lack of standing.  Home Builders have alleged concrete and particularized injuries, including changed development plans, increased project costs, and reductions in property values caused by the use of the TNW Determination to regulate their members' land.  These injuries will be redressed by a judgment declaring that the Agencies unlawfully promulgated the TNW Determination without notice and comment and in contravention of law.

## III.  **THE TNW DETERMINATION IS FINAL AGENCY ACTION.**

The APA defines "agency action" in pertinent part as "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent . . . thereof."  5 U.S.C. § 551(13).  The APA allows federal courts to review a "final agency action for which there is no other adequate remedy in a court." *Id.* at § 704.  To be regarded as final, the action "must (1) 'mark the

consummation of the agency's decisionmaking process,' and (2) 'be one by which rights or obligations have been determined, or from which legal consequences will flow.'" *Natural Res. Def. Council v. EPA*, 643 F.3d 311, 319 (D.C. Cir. 2011) ("*NRDC*") (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).

In this case, the Agencies' decisions comprising the TNW Determination are final on their face, binding on the Corps' Los Angeles District and Region 9 of EPA (as well as the State of Arizona, which administers the AZPDES program under Section 402 of the CWA), and must be used in CWA permitting and enforcement actions throughout the Santa Cruz River watershed. Moreover, the TNW Determination directly affects the obligations of Home Builders' members under the CWA, changing the manner in which their land is regulated under the CWA, imposing regulatory burdens and substantial costs from permitting, consultants, mitigation fees, and the re-design of certain projects to avoid impacts on washes considered to be jurisdictional, as explained above. Consequently, the TNW Determination is final agency action and subject to judicial review.

The district court held, however, that the TNW Determination is not final agency action because it "does not require NAHB members to take any

specific action. They either have obligations to seek permits under the CWA or they do not," relying principally on *Fairbanks North Star Borough v. U.S. Army Corps of Engineers*, 543 F.3d 586 (9th Cir. 2008), and an unreported decision from the District of Louisiana that followed *Fairbanks*. APP436-440. As explained below, these cases, which addressed site-specific JDs, and their reasoning are inapplicable to the Agencies' TNW Determination and are contrary to this Circuit's case law.

### A. The TNW Determination Is Final and Binding on the Agencies.

As explained above, the TNW Determination consists of two decisions. The first decision was issued by Colonel Magness, the Commander of the Corps' Los Angeles District. APP031-036. It begins with the statement that "[t]he Corps' Los Angeles District has determined that two reaches of the Santa Cruz River . . . are TNWs." Following nearly five pages of single-space discussion of the characteristics of these river reaches, such as their ordinary and peak flows, the volume of water needed for canoeing, and public access through trails and at bridges and highway turnouts, the agency concluded: "Collectively, the above factors demonstrate that the Study Reaches are navigable-in-fact, and thus a TNW, susceptible to use in interstate commerce with recreational navigation

activities." APP035-036. The decision contains nothing suggesting it was not intended to be final and used to administer and enforce the CWA.

The Corps' regulation under which Colonel Magness acted, 33 C.F.R. § 320.1(a)(6), authorizes district engineers to issue "formal determinations" concerning the applicability of the CWA and the Rivers and Harbors Act.[16] It provides that "[a] determination made pursuant to authorization shall constitute a Corps *final agency action*." *Id.* (emphasis added). The Corps adopted this rule "to provide clarity to the public . . . [so] that when a district engineer makes certain determinations under these regulations, the public can rely on that determination as a Corps final agency action." *Final Rule for Regulatory Programs of the Corps of Engineers*, 51 Fed. Reg. 41206 at 41207 (Nov. 13, 1986).

The second decision, EPA's decision, APP108-109, confirms the finality of the Corps' decision. EPA's Assistant Administrator for Water explained that EPA elected to review the Corps' navigability determination as a "special case." A "special case" is a circumstance where EPA makes the final determination and, as explained above, is governed by the Agencies' Geographic Jurisdiction Memorandum. This agreement

---

[16] In the district court, the Agencies' counsel cited 33 C.F.R. § 320.1(a)(6), in the memorandum of law supporting their motion to dismiss as the basis under which the District Engineer acted. *See* D.Ct. Dkt. 12, at page 8.

54

established the "policies and procedures pursuant to which [the Agencies]
determine the geographic jurisdictional scope of waters of the United States
for purposes of section 404," and provides that "EPA will be considered the
lead agency and will make the final decision if the agencies disagree."
Geographic Jurisdiction Memo., Addendum at 10.    It also provides that
"determinations made pursuant to the terms of this MOA *will be binding on
the Government and represent the Government's position in any subsequent
Federal action or litigation regarding the case*."  *Id.* (emphasis added).

Furthermore, EPA's "special case" decision states on its face that it is
final and must be implemented in the field:

> As a result of EPA's review of the District
> Determination and additional information available
> to EPA, I am affirming the Los Angeles District's
> determination that the two segments of the Santa
> Cruz River . . . are Traditional Navigable Waters
> (TNWs) . . . .
>
> I have asked EPA Region 9 to begin immediately
> to implement this decision and request that you
> also transmit this determination to the Los Angeles
> District so it may be used by the Corps to complete
> pending and future jurisdictional determinations
> for the Santa Cruz River watershed.

APP108, 109.

Under these circumstances, the TNW Determination is plainly final
agency action within the meaning of § 704 of the APA.  There is nothing

55

tentative or interlocutory about the Agencies' decisions – on their face, they are final. They "do[] not include any of the classic 'weasel words' through which agencies try – with variable success – to reserve discretion for themselves." *Cohen v. United States*, 578 F.3d 1, 7 (D.C. Cir. 2009), *aff'd in part, rev'd in part on other grounds*, 650 F.3d 717, 723 (2010) (rehearing en banc).

The second prong of the finality test is met when the action "determines rights or obligations" or has "legal consequences," such as "alter[ing] the legal regime to which the action agency is subject." *Bennett*, 520 U.S. at 178. In this Circuit, an agency action creating a "binding norm" that is used in connection with the administration of a regulatory program is a substantive rule and subject to judicial review. *See, e.g.*, *Cohen*, 578 F.3d at 7 ("The primary distinction between a substantive rule – really any rule – and a general statement of policy . . . turns on whether an agency intends to bind itself to a particular legal position.") (quoting *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997)).

For example, in *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000), this Court held that an EPA guidance document is final agency action because it "reflect[s] a settled agency position which has legal consequences both for State agencies administering their permit programs

56

and for companies" who must obtain permits to operate. *See also, e.g.*, *NRDC*, 643 F.3d at 320 (EPA guidance document binding agency regional directors is final agency action); *CropLife Am. v. EPA*, 329 F.3d 876, 881 (D.C. Cir. 2003) (EPA directive prohibiting consideration of certain studies creates a binding norm and is final agency action); *Gen. Elec. Corp. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002) ("an agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding . . . or is applied by the agency in a way that indicates it is binding").

Here, the TNW Determination fixed the legal status of more than 50 miles of the Santa Cruz River as a navigable-in-fact waterway under *The Daniel Ball* test. As a "special case" determination made by EPA Headquarters, it is binding on the Agencies and, in fact, is being used to administer the CWA throughout the Santa Cruz River watershed. Agency staff lacks discretion to disregard the TNW Determination and substitute a different navigable-in-fact waterway to make site-specific jurisdictional determinations. The reality is that Home Builders' members are now subject to CWA regulation only if their land contains a wash or other drainage feature that is a "water of the United States," which, as a result of the TNW Determination, is now based on its proximity and relationship to the Santa Cruz River. These circumstances clearly satisfy the second prong of the

*Bennett* finality test under this Circuit's case law.

### B.    The District Court Erred in Holding that the TNW Determination Is Not Final Agency Action.

#### 1.    The TNW Determination Is Final.

As an initial matter, the district court dismissed the plain language of 33 C.F.R. § 320.1(a)(6), stating that the agency's deliberate use of the phrase "final agency action" in its regulation "is not dispositive."   APP435-436. The district court instead relied on the Corps' regulations governing appeals of site-specific JDs, noting that when those regulations were adopted, the Corps stated "JDs are not necessarily 'final' even as an administrative matter" and may change over time.   APP435 (quoting *Final Rule Establishing an Administrative Appeal Process for the Regulatory Program of the Corps of Engineers*, 65 Fed. Reg. 16486, 16488 (March 28, 2000)).

The district court's determination is erroneous for several reasons. First, and most critically, the district court ignored EPA's decision, which was the Agencies' final decision and represents the Agencies' position in any subsequent federal action and litigation in which the navigability of the Santa Cruz River is at issue.   None of the cases and other authorities discussed by the district court involved these circumstances.

Second, as explained above at pages 14-16, a JD is site- and project-specific – it applies to a particular parcel of land and is issued to an "affected

party," i.e., "an individual who has an identifiable interest in the property."
33 C.F.R. § 331.2. Here, the challenged Corps' decision is a regulation
classifying river segments as a navigable-in-fact waterways and used to
establish jurisdiction over remote tributaries throughout an 8,600-square-
mile watershed. It was not issued pursuant to the Corps' regulations
governing administrative appeals, as shown by the fact that the Corps made
no effort to comply with them. And the fact that the TNW Determination
may be amended in the future does not alter its finality. *See, e.g.*,
*Appalachian Power*, 208 F.3d at 1022.

Third, the district court erroneously relied on several older district
court cases interpreting the effect of the phrase "final agency action" in 33
C.F.R. § 320.1(a)(6). APP436. These cases involved pre-enforcement
disputes concerning the Agencies' assertion of jurisdiction over a
landowner's property. *See Hampton Venture No. One v. United States*, 768
F. Supp. 174, 175 (E.D. Va. 1991) (challenge to JD issued by the Corps
asserting jurisdiction over developer's property); *Lotz Realty Co. v. United
States*, 757 F. Supp. 692, 694 (E.D. Va. 1990) (challenge to Corps' notice
that developer must obtain an individual permit under CWA Section 404);
*Route 26 Land Dev. Ass'n v. U.S. Gov't*, 753 F. Supp. 532, 534 (D. Del.
1990) (challenge to Corps' cease-and-desist order requiring landowner to

remove fill material from its property). These cases are not analogous to a regulation classifying a water body as navigable-in-fact, and none of them was elevated by EPA Headquarters for review as a special case. Further, to the extent that they involved pre-enforcement orders, they have been overruled by *Sackett*. 132 S. Ct. at 1372-75.[17]

Finally, the cases were decided well before the Corps adopted its current regulations governing administrative appeals of permitting decisions and site-specific JDs. *See Final Rule Establishing an Administrative Appeal Process*, *supra*, (appeals of JDs, adopted in 2000); *Final Rule Establishing an Administrative Appeal Process for the Regulatory Program of the Corps of Engineers*, 64 Fed. Reg. 11708 (March 9, 1999) (appeals of permit denials and declined permits). In these rulemakings, the Corps established a separate administrative process and finality requirements for JDs and permitting decisions. But the Corps did <u>not</u> otherwise limit the general authority of District Engineers to issue final, binding determinations on which the public can rely. *Compare* 33 C.F.R. § 320.1(a)(2) *with* 33 C.F.R. § 320.1(a)(6).

---

[17] Notably, the counsel for plaintiffs in *Hampton Venture* and *Lotz Realty* was threatened with sanctions for "repeatedly seeking pre-enforcement review of compliance orders and cease and desist orders issued by EPA and the Corps." *Hampton Venture*, 768 F. Supp. at 176 n.2.

## 2. The TNW Determination Alters Rights and Obligations and Has Legal Consequences.

The district court also held that the TNW Determination is not reviewable because it "does not require NAHB members to do anything, nor does it expose them to additional penalties in a future enforcement proceeding, or impact their ability to obtain a permit from the Corps." APP438-440. Instead, it "merely warns developers . . . that they may be required to obtain a permit for certain activities in certain locations . . . ." APP439. The district court's principal authority for this erroneous holding is *Fairbanks* – a case involving judicial review of a site-specific JD – and this Court's prior decision, *NAHB v. EPA*, which did not address whether the TNW Determination is final agency action under the APA and instead addressed Home Builders' standing.

*Fairbanks*, as well as *Belle Co., LLC v. U.S. Army Corps of Engineers*, 2013 WL 773730 (M.D. La. Feb. 23, 2013), which followed *Fairbanks*, involved challenges to site-specific JDs, which are not analogous to a regulation that fixes the legal status of a waterway as navigable-in-fact. On this basis alone, both cases are distinguishable. Nor did those cases involve a decision that, by rule (33 C.F.R. § 320.1(a)(6)), is final agency action on which the public can rely in future permitting and enforcement proceedings, which was reviewed and affirmed by EPA Headquarters as a

"special case" and is binding on the federal government.

In addition, *Fairbanks* held that the JD for the municipality's land did not meet the second *Bennett* finality requirement because it did not require the landowner to do anything. 543 F.3d at 593-97. For example, the court explained that "[t]he Corps does not alter the physical reality or the legal standards used to assess reality simply by opining that a particular site contains waters of the United States." *Id.* at 594. Instead, the Ninth Circuit stated that the practical effect of the JD was to place the municipality, as landowner, "on notice that construction might require a Section 404 permit." *Id.* at 594. The district court found this discussion persuasive. *See* APP438-440 (TNW Determination merely warns Home Builders' members "that they may be required to obtain a permit in certain locations").

However, the district court's analysis improperly narrows the *Bennett* test and conflicts with the law of this Circuit, which holds that agency guidelines are final agency action when "the agency action binds private parties *or the agency itself* with the 'force of law.'" *Gen. Elec.*, 290 F.3d at 382 (emphasis added). In other words,

> "[i]f a statement denies the decision-maker discretion in the area of its coverage, so that [the agency] will automatically decline to entertain challenges to the statement's position, then the statement is binding, and creates rights or obligations.". . . [A]n agency announcement has

62

> "present-day binding effect" if the agency is
> "simply unready to hear new argument" in
> proceedings governed by the announcement.

*Id.* (quoting *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1320,

1321 (D.C. Cir. 1988) (citations omitted). Likewise, in *NRDC*, the Court

held that an EPA guidance document was final agency action because it

> altered the legal regime by resolving the question
> posed by the Clean Air Act Advisory Committee:
> "Is it legally permissible under either section 185
> or 172(e) for a State to exercise the discretion
> identified in [the options listed in this letter]?" . . .
> Answering that question affirmatively, the
> Guidance binds EPA regional directors and thus
> qualifies as final agency action.

643 F.3d at 320 (citation omitted).

Thus, in this Circuit, an agency directive that establishes a substantive

norm or otherwise binds the agency in administering a program is final

agency action, regardless of whether the directive requires regulated parties

immediately to do anything. To hold otherwise would insulate many agency

regulations from judicial review because they merely "warn" the public that

a future activity may be regulated under a statute, even though the regulation

is binding on the agency and alters how the statute is administered. *See, e.g.*,

*NAHB II*, 440 F.3d at 462-63 (facial challenge to Corps' rule defining

"discharge of dredged material"); *Nat'l Mining Ass'n*, 145 F.3d 1401-03

(D.C. Cir. 1998) (same). Furthermore, because the TNW Determination

binds the Agencies, it directly impacts the rights and obligations of Home Builders' members. Before the TNW Determination, during the permitting process, landowners could assert that the Colorado River was the nearest TNW and, under *Rapanos*, only drainage features with a significant nexus to it were within the Agencies' jurisdiction. By fixing the legal status of the Santa Cruz River as navigable-in-fact, the TNW Determination removes that right and obliges landowners to seek permits for discharges into water bodies that have a significant nexus to the Santa Cruz River.

## CONCLUSION

For the foregoing reasons, the district court erred in dismissing Home Builders' complaint for lack of subject matter jurisdiction. Home Builders request that the Court reverse the district court's order of dismissal, and remand the case to the district court for a determination on the merits of Home Builders' claims.

RESPECTFULLY SUBMITTED this 10th day of March, 2014.

FENNEMORE CRAIG, P.C.
*/s/ Norman D. James*
Norman D. James
Aaron T. Martin
Fennemore Craig, P.C.
2394 East Camelback Road, Ste. 600
Phoenix, AZ 85016
Telephone (602) 916-5346
E-mail njames@fclaw.com
        amartin@fclaw.com
*Attorneys for Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this brief complies with the type volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure. Except for the portions of the brief described in Circuit Rule 32(a)(1), this brief contains 13,831 words.


*/s/ Norman D. James*
Norman D. James
Attorney for Appellants

## **CERTIFICATE OF SERVICE**

On behalf of Appellants National Association of Home Builders, Southern Arizona Home Builders Association, and Home Builders Association of Central Arizona, I hereby certify that on this 10th day of March, 2014, I electronically filed APPELLANTS' OPENING BRIEF and the APPENDIX through the Court's CM/ECF system.

I also certify that on that same day I caused eight paper copies of APPELLANTS' OPENING BRIEF and ten copies of the APPENDIX to be mailed via United States mail, postage prepaid, to the Clerk of the Court, addressed as follows:

      Clerk of the Court
      United States Court of Appeals
       for the District of Columbia Circuit
      E. Barrett Prettyman United States Courthouse
      333 Constitution Avenue, N.W.
      Washington, D.C.  20001-2866

I further certify that on that same day, I have caused two copies of APPELLANT'S OPENING BRIEF and one copy of the APPENDIX to be served on counsel of record for Appellees by mailing them via United States Mail, postage prepaid, as follows:

      Katherine J. Barton
      U. S. Department of Justice
      Environment & Natural Resources Division
      P.O. Box 23795 L'Enfant Plaza Station
      Washington, D.C.  20026-3795

*/s/  Norman D. James*
Norman D. James
Attorney for Appellants

8964144.2

66

## ADDENDUM TO OPENING BRIEF

## PERTINENT STATUTES, REGULATIONS AND OTHER AUTHORITIES

5 U.S.C. § 551(4) ...................................................................................2

5 U.S.C. § 701(a) ...................................................................................2

5 U.S.C. § 702 ........................................................................................2

5 U.S.C. § 704 ........................................................................................3

33 U.S.C. § 1311(a) ...............................................................................3

33 U.S.C. § 1342(a)(1) ..........................................................................3

33 U.S.C. § 1344(a) ...............................................................................4

33 U.S.C. § 1362(7) ...............................................................................4

33 C.F.R. § 320.1(a) [excerpts] .............................................................4

33 C.F.R. § 328.3(a) ...............................................................................5

33 C.R.F. pt. 331 [excerpts] ..................................................................6

U.S. EPA and U.S. Department of the Army, Memorandum of
Agreement Between the Department of the Army/Environmental
Protection Agency Concerning the Determination of the
Geographic Jurisdiction of the Section 404 Program and the
Application of the Exemptions under Section 404(f) of the Clean
Water Act (Rev. Jan. 1993) ..................................................................10

U.S. Army Corps of Engineers, Regulatory Guidance Letter No.
08-02, "Jurisdictional Determinations" (June 26, 2008) ..................17

Approved Jurisdictional Determination Form, U.S. Army Corps of
Engineers ..............................................................................................28

**Administrative Procedure Act, 5 U.S.C. § 551,** *et seq.*

## § 551.    Definitions

For the purpose of this subchapter –

…

(4) "rule" means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing[.]

## § 701.    Application; definitions

(a) This chapter applies, according to the provisions thereof, except to the extent that –

(1) statutes preclude judicial review; or

(2) agency action is committed to agency discretion by law.

## § 702.    Right of review

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided,* That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief

if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

## § 704.    Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

## Clean Water Act, 33 U.S.C. §§ 1251-1387

### § 1311.    Effluent limitations

**(a) Illegality of pollutant discharges except in compliance with law**

Except as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful.

### § 1342.    National pollutant discharge elimination system

**(a) Permits for discharge of pollutants**

**(1)** Except as provided in sections 1328 and 1344 of this title, the Administrator may, after opportunity for public hearing issue a permit for the discharge of any pollutant, or combination of pollutants, notwithstanding section 1311(a) of this title, upon condition that such discharge will meet either (A) all applicable requirements under sections 1311, 1312, 1316, 1317, 1318, and 1343 of this title, or (B) prior to the taking of necessary implementing actions relating to all such requirements, such conditions as the Administrator determines are necessary to carry out the provisions of this chapter.

...

## § 1344.    Permits for dredged or fill material

### (a) Discharge into navigable waters at specified disposal sites

The Secretary may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites. Not later than the fifteenth day after the date an applicant submits all the information required to complete an application for a permit under this subsection, the Secretary shall publish the notice required by this subsection.

...

## § 1362.    Definitions

Except as otherwise specifically provided, when used in this chapter:

...

**(7)** The term "navigable waters" means the waters of the United States, including the territorial seas.

## Code of Federal Regulations / Title 33 - Navigation and Navigable Waters

### PART 320 – GENERAL REGULATORY POLICIES

### § 320.1    Purpose and scope.

(a) *Regulatory approach of the Corps of Engineers.* (1) The U.S. Army Corps of Engineers has been involved in regulating certain activities in the nation's waters since 1890. Until 1968, the primary thrust of the Corps' regulatory program was the protection of navigation. As a result of several new laws and judicial decisions, the program has evolved to one involving the consideration of the full public interest by balancing the favorable impacts against the detrimental impacts. This is known as the "public interest review." The program is one which reflects the national concerns for both the protection and utilization of important resources.

(2) The Corps is a highly decentralized organization. Most of the authority for administering the regulatory program has been delegated to the thirty-six district engineers and eleven division engineers. A district engineer's decision on an approved jurisdictional determination, a permit denial, or a

declined individual permit is subject to an administrative appeal by the affected party in accordance with the procedures and authorities contained in 33 CFR part 331. Such administrative appeal must meet the criteria in 33 CFR 331.5; otherwise, no administrative appeal of that decision is allowed. The terms "approved jurisdictional determination," "permit denial," and "declined permit" are defined at 33 CFR 331.2. There shall be no administrative appeal of any issued individual permit that an applicant has accepted, unless the authorized work has not started in waters of the United States, and that issued permit is subsequently modified by the district engineer pursuant to 33 CFR 325.7 (see 33 CFR 331.5(b)(1)). An affected party must exhaust any administrative appeal available pursuant to 33 CFR part 331 and receive a final Corps decision on the appealed action prior to filing a lawsuit in the Federal courts (see 33 CFR 331.12).

...

(6) The Corps has authorized its district engineers to issue formal determinations concerning the applicability of the Clean Water Act or the Rivers and Harbors Act of 1899 to activities or tracts of land and the applicability of general permits or statutory exemptions to proposed activities. A determination pursuant to this authorization shall constitute a Corps final agency action. Nothing contained in this section is intended to affect any authority EPA has under the Clean Water Act.

...

## PART 328 – DEFINTION OF WATERS OF THE UNITED STATES

### § 328.3    Definitions.

For the purpose of this regulation these terms are defined as follows:

(a) The term waters of the United States means

(1) All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;

(2) All interstate waters including interstate wetlands;

(3) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie

potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce including any such waters:

(i) Which are or could be used by interstate or foreign travelers for recreational or other purposes; or

(ii) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or

(iii) Which are used or could be used for industrial purpose by industries in interstate commerce;

(4) All impoundments of waters otherwise defined as waters of the United States under the definition;

(5) Tributaries of waters identified in paragraphs (a) (1) through (4) of this section;

(6) The territorial seas;

(7) Wetlands adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (a) (1) through (6) of this section.

(8) Waters of the United States do not include prior converted cropland. Notwithstanding the determination of an area's status as prior converted cropland by any other Federal agency, for the purposes of the Clean Water Act, the final authority regarding Clean Water Act jurisdiction remains with EPA.

...

## PART 331 – ADMINISTRATIVE APPEAL PROCESS

### § 331.1      Purpose and policy.

(a) *General.* The purpose of this part is to establish policies and procedures to be used for the administrative appeal of approved jurisdictional determinations (JDs), permit applications denied with prejudice, and declined permits. The appeal process will allow the affected party to pursue an administrative appeal of certain Corps of Engineers decisions with which they disagree. The basis for an appeal and the specific policies and procedures of the appeal process are described in the following sections. It

shall be the policy of the Corps of Engineers to promote and maintain an administrative appeal process that is independent, objective, fair, prompt, and efficient.

...

## § 331.2    Definitions.

The terms and definitions contained in 33 CFR Parts 320 through 330 are applicable to this part. In addition, the following terms are defined for the purposes of this part:

*Affected party* means a permit applicant, landowner, a lease, easement or option holder (i.e., an individual who has an identifiable and substantial legal interest in the property) who has received an approved JD, permit denial, or has declined a proffered individual permit.

*Agent(s)* means the affected party's business partner, attorney, consultant, engineer, planner, or any individual with legal authority to represent the appellant's interests.

*Appealable action* means an approved JD, a permit denial, or a declined permit, as these terms are defined in this section.

*Appellant* means an affected party who has filed an appeal of an approved JD, a permit denial or declined permit under the criteria and procedures of this part.

*Approved jurisdictional determination* means a Corps document stating the presence or absence of waters of the United States on a parcel or a written statement and map identifying the limits of waters of the United States on a parcel. Approved JDs are clearly designated appealable actions and will include a basis of JD with the document.

*Basis of jurisdictional determination* is a summary of the indicators that support the Corps approved JD. Indicators supporting the Corps approved JD can include, but are not limited to: indicators of wetland hydrology, hydric soils, and hydrophytic plant communities; indicators of ordinary high water marks, high tide lines, or mean high water marks; indicators of adjacency to navigable or interstate waters; indicators that the wetland or waterbody is of part of a tributary system; or indicators of linkages between isolated water bodies and interstate or foreign commerce.

...

*Jurisdictional determination (JD)* means a written Corps determination that a wetland and/or waterbody is subject to regulatory jurisdiction under Section 404 of the Clean Water Act (33 U.S.C. 1344) or a written determination that a waterbody is subject to regulatory jurisdiction under Section 9 or 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. 401 et seq.). Additionally, the term includes a written reverification of expired JDs and a written reverification of JDs where new information has become available that may affect the previously written determination. For example, such geographic JDs may include, but are not limited to, one or more of the following determinations: the presence or absence of wetlands; the location(s) of the wetland boundary, ordinary high water mark, mean high water mark, and/or high tide line; interstate commerce nexus for isolated waters; and adjacency of wetlands to other waters of the United States. All JDs will be in writing and will be identified as either preliminary or approved. JDs do not include determinations that a particular activity requires a DA permit.

*Notification of Appeal Process (NAP)* means a fact sheet that explains the criteria and procedures of the administrative appeal process. Every approved JD, permit denial, and every proffered individual permit returned for reconsideration after review by the district engineer in accordance with § 331.6(b) will have an NAP form attached.

...

*Preliminary JDs* are written indications that there may be waters of the United States on a parcel or indications of the approximate location(s) of waters of the United States on a parcel. Preliminary JDs are advisory in nature and may not be appealed. Preliminary JDs include compliance orders that have an implicit JD, but no approved JD.

...

*Request for appeal (RFA)* means the affected party's official request to initiate the appeal process. The RFA must include the name of the affected party, the Corps file number of the approved JD, denied permit, or declined permit, the reason(s) for the appeal, and any supporting data and information. No new information may be submitted. A grant of right of entry for the Corps to the project site is a condition of the RFA to allow the RO to

clarify elements of the record or to conduct field tests or sampling for purposes directly related to the appeal. A standard RFA form will be provided to the affected party with the NAP form. For appeals of decisions related to unauthorized activities a signed tolling agreement, as required by 33 CFR 326.3(e)(1)(v), must be included with the RFA, unless a signed tolling agreement has previously been furnished to the Corps district office. The affected party initiates the administrative appeal process by providing an acceptable RFA to the appropriate Corps of Engineers division office. An acceptable RFA contains all the required information and provides reasons for appeal that meets the criteria identified in § 331.5.

...

### § 331.4    Notification of appealable actions.

Affected parties will be notified in writing of a Corps decision on those activities that are eligible for an appeal. For approved JDs, the notification must include an NAP fact sheet, an RFA form, and a basis of JD. For permit denials, the notification must include a copy of the decision document for the permit application, an NAP fact sheet and an RFA form. For proffered individual permits, when the initial proffered permit is sent to the applicant, the notification must include an NAO fact sheet. For declined permits (i.e., proffered individual permits that the applicant refuses to accept and sends back to the Corps), the notification must include an NAP fact sheet and an RFA form. Additionally, an affected party has the right to obtain a copy of the administrative record.

2419976




MEMORANDUM OF AGREEMENT
BETWEEN THE DEPARTMENT OF THE ARMY
AND THE ENVIRONMENTAL PROTECTION AGENCY
CONCERNING THE DETERMINATION OF THE
GEOGRAPHIC JURISDICTION OF THE SECTION 404 PROGRAM
AND THE APPLICATION OF THE EXEMPTIONS
UNDER SECTION 404(f) OF THE CLEAN WATER ACT.

## I.  PURPOSE AND SCOPE.

The United States Department of the Army (Army) and the United States Environmental Protection Agency (EPA) hereby establish the policy and procedures pursuant to which they will determine the geographic jurisdictional scope of waters of the United States for purposes of section 404 and the application of the exemptions under section 404(f) of the Clean Water Act (CWA).

The Attorney General of the United States issued an opinion on September 5, 1979, that the Administrator of EPA (Administrator) has the ultimate authority under the CWA to determine the geographic jurisdictional scope of section 404 waters of the United States and the application of the section 404(f) exemptions. Pursuant to this authority and for purposes and effective administration of the 404 program, this Memorandum of Agreement (MOA) sets forth an appropriate allocation of responsibilities between the EPA and the U.S. Army Corps of Engineers (Corps) to determine geographic jurisdiction of the section 404 program and the applicability of the exemptions under section 404(f) of the CWA.

## II.  POLICY.

It shall be the policy of the Army and EPA for the Corps to continue to perform the majority of the geographic jurisdictional determinations and determinations of the applicability of the exemptions under section 404(f) as part of the Corps role in administering the section 404 regulatory program. It shall also be the policy of the Army and EPA that the Corps shall fully implement EPA guidance on determining the geographic extent of section 404 jurisdiction and applicability of the 404(f) exemptions.

Case-specific determinations made pursuant to the terms of this MOA will be binding on the Government and represent the Government's position in any subsequent Federal action or litigation regarding the case. In making its determinations, the

10

- 2 -

Corps will implement and adhere to the "Federal Manual for Identifying and Delineating Jurisdictional Wetlands," EPA guidance on isolated waters, and other guidance, interpretations, and regulations issued by EPA to clarify EPA positions on geographic jurisdiction and exemptions. All future programmatic guidance, interpretations, and regulations on geographic jurisdiction, and exemptions shall be developed by EPA with input from the Corps; however, EPA will be considered the lead agency and will make the final decision if the agencies disagree.

## III. DEFINITIONS.

A. Special Case. A special case is a circumstance where EPA makes the final determination of the geographic jurisdictional scope of waters of the United States for purposes of section 404.

Special cases may be designated in generic or project-specific situations where significant issues or technical difficulties are anticipated or exist, concerning the determination of the geographic jurisdictional scope of waters of the United States for purposes of section 404 and where clarifying guidance is or is likely to be needed. Generic special cases will be designated by easily identifiable political or geographic subdivisions such as township, county, parish, state, EPA region, or Corps division or district. EPA will ensure that generic special cases are marked on maps or some other clear format and provided to the appropriate District Engineer (DE).

B. Special 404(f) Matters. A special 404(f) matter is a circumstance where EPA makes the final determination of the applicability of exemptions under section 404(f) of the CWA.

A special 404(f) matter may be designated in generic or project-specific situations where significant issues or technical difficulties are anticipated or exist, concerning the applicability of exemptions under section 404(f), and where clarifying guidance is, or is likely, to be needed. Generic special 404(f) matters will be designated by easily identifiable political or geographic subdivisions such as township, county, parish, state, EPA region, or Corps division or district and by specific 404(f) exemption (e.g., 404(f)(1)(A)).

## IV. PROCEDURES.

A. Regional Lists. Each regional administrator (RA) shall maintain a regional list of current designated special cases and special 404(f) matters within each region, including documentation, if appropriate, that there are no current designated special cases or special 404(f) matters in the region.

11

- 3 -

The RA shall create an initial regional list and transmit it to the appropriate DE within 30 days of the date of the last signature on this MOA. In order to be eligible for a regional list, the designated special cases and special 404(f) matter must be approved by the Administrator. (NOTE: Those geographic areas designated as current special cases pursuant to the 1980 Memorandum of Understanding on Geographic Jurisdiction of the Section 404 Program, may be incorporated into the initial regional lists without additional approval by the Administrator based on township, county, parish, state or other appropriate designation, as described in paragraph III. A. of this MOA but will no longer be designated by forest cover type.)

     B. <u>Changes to the Regional Lists</u>. Changes to the regional lists shall be proposed by the RA and approved by the Administrator and may include additions to, amendments to, or deletions from the regional lists. When the RA proposes an addition, amendment, or deletion to the regional list, the RA shall forward the proposal to EPA Headquarters for review and approval. When the RA proposes an addition or amendment in writing or by phone to the appropriate Corps DE, the Corps will not make a final geographic jurisdictional determination within the proposed special case area for a period of ten working days from the date of the RA's notification. The Corps may proceed to make determinations in the proposed special case area after the ten day period if it has not been provided final notification of EPA Headquarters approval of the RA's proposed changes. Deletions to the regional list do not become effective until a revised regional list, approved by EPA Headquarters, is provided to the appropriate DE.

     C. <u>Project Reviews</u>. The DE shall review section 404 preapplication inquiries, permit applications, and other matters brought to his attention, which involve the discharge of dredged or fill material into waters of the United States to determine if a current designated special case or special 404(f) matter is involved.

     (1) Special Cases/Special 404(f) Matters.

          For those projects involving a current designated special case or special 404(f) matter, the DE shall request that the RA make the final determination of the geographic juris-dictional scope of waters of the United States for purposes of section 404 or applicability of the exemptions under section 404(f). The RA shall make the final determination, subject to discretionary review by EPA Headquarters, and transmit it to the DE, and to the applicant/inquirer.

- 4 -

(2)  Non-Special Cases/Non-Special 404(f) Matters.

For those projects not involving a current designated special case or special 404(f) matter, the DE shall make final determinations and communicate those determinations without a requirement for prior consultation with EPA.

D.  Determination of Special Cases or Special 404(f) Matters.  When the special case or special 404(f) matter has been designated on a project-specific basis, issuance of the final determination by the RA will serve as guidance relevant to the specific facts of each particular situation, and will terminate the special case or special 404(f) matter designation.  When the special case or special 404(f) matter has been designated on a generic basis, EPA Headquarters will develop, in consultation with Army, relevant programmatic guidance for determining the geographic jurisdictional scope of waters of the United States for the purpose of section 404 or the applicability of exemptions under section 404(f).  Special cases and special 404(f) matters designated on a generic basis remain in effect until (1) a deletion from the regional list is proposed and processed according to paragraph IV-B of this MOA, or (2) EPA Headquarters issues programmatic guidance that addresses the relevant issues and specifically deletes the special case or special 404(f) matter from the regional list(s), whichever occurs first.

E.  Uncertainties Regarding Special Cases/Special 404(f) Matters.  Should any uncertainties arise in determining whether a particular action involves a current designated special case or special 404(f) matter, the DE shall consult with the RA.  Upon completion of the consultation, the RA will make the final determination as to whether the action involves a current designated special case or special 404(f) matter.

F.  Compliance Tracking.  In order to track the DE's compliance with EPA guidance, the DE shall make his files available for inspection by the RA at the district office, including field notes and data sheets utilized in making final determinations as well any photographs of the site that may be available.  Copies of final geographic jurisdictional determinations will be provided to the RA upon request at no cost to EPA unless the sample size exceeds 10 percent of the number of determinations for the sample period.  Copies in excess of a 10 percent sample will be provided at EPA expense.  To ensure that EPA is aware of determinations being made for which notification is not forwarded through the public notice process, the Corps will provide copies to EPA of all final determinations of no geographic jurisdiction and all final determinations that an exemption under Section 404(f) is applicable.  Should EPA become aware of any problem trends with the DE's implementation of guidance, EPA shall initiate interagency discussions to address the issue.

13

- 5 -

## V.    RELATED ACTIONS.

A.    Enforcement Situations.    For those investigations made pursuant to the 1989 Enforcement MOA between Army and EPA concerning Federal enforcement of section 404 of the CWA, which involve areas that are current designated special cases, the RA shall make the final determination of the geographic jurisdictional scope of waters of the United States for purposes of section 404.    The RA's determination is subject to discretionary review by EPA Headquarters, and will be binding regardless of which agency is subsequently designated lead enforcement agency pursuant to the 1989 Enforcement MOA.    For those investigations not involving special cases, the agencies will proceed in accordance with the provisions of the 1989 Enforcement MOA.

For those investigations made pursuant to the 1989 Enforcement MOA between Army and EPA concerning Federal enforcement of section 404 of the CWA, which involve current designated special 404(f) matters, the RA shall make the final determination of the applicability of the exemptions under section 404(f).    The RA determination is subject to discretionary review by EPA Headquarters, and is binding regardless of which agency is subsequently designated lead enforcement agency pursuant to the 1989 Enforcement MOA.    For those investigations not involving special 404(f) matters, the agencies will proceed in accordance with the provisions of the 1989 Enforcement MOA.

B.    Advanced Identification.    EPA may elect to make the final determination of the geographic jurisdictional scope of waters of the United States for purposes of section 404, as part of the advanced identification of disposal sites under 40 CFR 230.80, subject to discretionary review by EPA Headquarters, and regardless of whether the areas involved are current designated special cases, unless the DE has already made a final geographic jurisdictional determination.    Any determinations under this section shall be completed in accordance with paragraph IV of this MOA.

C.    404(c) Actions.    EPA may elect to make the final determination of the geographic jurisdictional scope of waters of the United States for purposes of section 404(c) of the CWA.

## VI.  GENERAL PROVISIONS.

A.    All final determinations must be in writing and signed by either the DE or RA.    Final determination of the DE or RA made pursuant to this MOA or the 1980 Memorandum of Understanding on Geographic Jurisdiction of the Section 404 Program, will be binding on the Government and represent the Government's position in any subsequent Federal action or litigation concerning that final determination.

- 6 -

B.  The procedures and responsibilities of each agency specified in this MOA may be delegated to appropriate subordinates consistent with established agency procedure. Headquarters procedures and responsibilities specified in the MOA may only be delegated within headquarters.

C.  Nothing in this document is intended to diminish, modify, or otherwise affect the statutory or regulatory authorities of either agency.

D.  This agreement shall take effect and supercede the April 23, 1980, Memorandum of Understanding on Geographic Jurisdiction of the Section 404 Program on the 60th day after the date of the last signature below and will continue in effect for five years, unless extended, modified or revoked by agreement of both parties, or revoked by either party alone upon six months written notice, prior to that time.


Robert W. Page
Assistant Secretary of the
Army (Civil Works)

Rebecca W. Hanmer
Acting Assistant Administrator
for Water
U. S. Environmental Protection
Agency


JANUARY 19, 1989
Date

January 19, 1989
Date

15



United States Environmental Protection Agency
Office of Water
Washington, D.C. 20460



United States Department of the Army
Office of the Assistant Secretary
Washington, D.C. 20310-0103

## AMENDMENT TO THE JANUARY 19, 1989, DEPARTMENT OF THE ARMY/ENVIRONMENTAL PROTECTION AGENCY MEMORANDUM OF AGREEMENT CONCERNING THE DETERMINATION OF THE GEOGRAPHIC JURISDICTION OF THE SECTION 404 PROGRAM AND THE APPLICATION OF THE EXEMPTIONS UNDER SECTION 404(f) OF THE CLEAN WATER ACT

In order to assure consistency and predictability in wetland determinations made by the two agencies, the following amendment to the January 19, 1989, Department of the Army/Environmental Protection Agency Memorandum of Agreement concerning the determination of the geographic jurisdiction of the Section 404 program and the application of the exemptions under Section 404(f) of the Clean Water Act is hereby adopted:

Effective on the date of the last signature below, the second sentence of paragraph 2 of the "Policy" section is amended to read as follows (new language is *italicized*; deletions are lined-out):

"In making ~~its~~ *their* determinations, the Corps *and EPA* will adhere to the "~~Federal Manual for Identifying and Delineating Jurisdictional Wetlands~~" *"Corps of Engineers Wetlands Delineation Manual" (Waterways Experiment Station Technical Report Y-87-1, January, 1987) and* EPA guidance on isolated waters, and other guidance, interpretations, and regulations issued by EPA to clarify EPA positions on geographic jurisdiction and exemptions."


Nancy P. Dorn
Assistant Secretary of the Army
(Civil Works)

_____
        Date


LaJuana S. Wilcher
Assistant Administrator for Water
Environmental Protection Agency

1/4/93
        Date

16



**US Army Corps of Engineers®**

# REGULATORY GUIDANCE LETTER

No. 08-02                                                                 Date: 26 June 2008

---

SUBJECT: Jurisdictional Determinations

1. <u>Purpose</u>. Approved jurisdictional determinations (JDs) and preliminary JDs are tools used by the U.S. Army Corps of Engineers (Corps) to help implement Section 404 of the Clean Water Act (CWA) and Sections 9 and 10 of the Rivers and Harbors Act of 1899 (RHA). This Regulatory Guidance Letter (RGL) explains the differences between these two types of JDs and provides guidance on when an approved JD is required and when a landowner, permit applicant, or other "affected party"[1] can decline to request and obtain an approved JD and elect to use a preliminary JD instead.

    a. This guidance does not address which waterbodies are subject to CWA or RHA jurisdiction. For guidance on CWA and RHA jurisdiction, see Corps regulations, "Memorandum re: Clean Water Act (CWA) Jurisdiction Following U.S. Supreme Court Discussion in Rapanos v. United States," dated 19 June 2007, and the documents referenced therein.

    b. This guidance takes effect immediately, and supersedes any inconsistent guidance regarding JDs contained in RGL 07-01.

2. <u>Approved JDs</u>. An approved JD is an official Corps determination that jurisdictional "waters of the United States," or "navigable waters of the United States," or both, are either present or absent on a particular site. An approved JD precisely identifies the limits of those waters on the project site determined to be jurisdictional under the CWA/RHA. (See 33 C.F.R. 331.2.)

    a. The Corps will provide (subject to the limitation contained in paragraph 5.b. below) an approved JD to any landowner, permit applicant, or other "affected party" when:

        (1) a landowner, permit applicant, or other "affected party" requests an approved JD by name or otherwise requests an official jurisdictional determination, whether or not it is referred to as an "approved JD";

---

[1] As defined at 33 CFR 331.2 "affected party" means a permit applicant, landowner, a lease, easement or option holder (i.e., an individual who has an identifiable and substantial legal interest in the property) who has received an approved JD, permit denial or has declined a proffered individual permit.

17

(2)  a landowner, permit applicant, or other "affected party" contests jurisdiction over a particular water body or wetland, and where the Corps is allowed access to the property and is otherwise able to produce an approved JD; or

(3)  the Corps determines that jurisdiction does not exist over a particular water body or wetland.

b.  An approved JD:

(1)  constitutes the Corps' official, written representation that the JD's findings are correct;

(2)  can be relied upon by a landowner, permit applicant, or other "affected party" (as defined at 33 C.F.R. 331.2) who receives an approved JD for five years (subject to certain limited exceptions explained in RGL 05-02);

(3)  can be used and relied on by the recipient of the approved JD (absent extraordinary circumstances, such as an approved JD based on incorrect data provided by a landowner or consultant) if a CWA citizen's lawsuit is brought in the Federal Courts against the landowner or other "affected party," challenging the legitimacy of that JD or its determinations;  and

(4)  can be immediately appealed through the Corps' administrative appeal process set out at 33 CFR Part 331.

c.  The District Engineer retains the discretion to use an approved JD in any other circumstance where he or she determines that is appropriate given the facts of the particular case.

d.  If wetlands or other water bodies are present on a site, an approved JD for that site will identify and delineate those water bodies and wetlands that are subject to CWA/RHA jurisdiction, and serve as an initial step in the permitting process.

e.  Approved JDs shall be documented in accordance with the guidance provided in RGL 07-01.  Documentation requires the use of the JD Form published on June 5, 2007, or as modified by ORM2 or subsequent revisions to the June 5, 2007 JD form approved by Corps Headquarters.  Districts will continue to post approved JDs on their websites.

3.  A permit applicant's option to decline to request and obtain an approved JD.  While a landowner, permit applicant, or other "affected party" can elect to request and obtain an approved JD, he or she can also decline to request an approved JD, and instead obtain a Corps individual or general permit authorization based on either a preliminary JD, or, in appropriate circumstances (such as authorizations by non-reporting nationwide general permits), no JD whatsoever.  The Corps will determine what form of JD is appropriate

for any particular circumstance based on all the relevant factors, to include, but not limited to, the applicant's preference, what kind of permit authorization is being used (individual permit versus general permit), and the nature of the proposed activity needing authorization.

4.  Preliminary JDs.  Preliminary JDs are non-binding ". . . written indications that there may be waters of the United States, including wetlands, on a parcel or indications of the approximate location(s) of waters of the United States or wetlands on a parcel. Preliminary JDs are advisory in nature and may not be appealed."  (See 33 C.F.R. 331.2.)

    a.  A landowner, permit applicant, or other "affected party" may elect to use a preliminary JD to voluntarily waive or set aside questions regarding CWA/RHA jurisdiction over a particular site, usually in the interest of allowing the landowner or other "affected party" to move ahead expeditiously to obtain a Corps permit authorization where the party determines that is in his or her best interest to do so.

    b.  It is the Corps' goal to process both preliminary JDs and approved JDs within 60 days as detailed in paragraph 5 below, so the applicant or other affected party's choice of whether to use a preliminary JD or approved JD should not affect this goal.

    c.  A landowner, permit applicant, or other "affected party" may elect to use a preliminary JD even where initial indications are that the water bodies or wetlands on a site may not be jurisdictional, if the affected party makes an informed, voluntary decision that is in his or her best interest not to request and obtain an approved JD.

    d.  For purposes of computation of impacts, compensatory mitigation requirements, and other resource protection measures, a permit decision made on the basis of a preliminary JD will treat all waters and wetlands that would be affected in any way by the permitted activity on the site as if they are jurisdictional waters of the U.S.

    e.  Preliminary JDs are also commonly used in enforcement situations because access to a site may be impracticable or unauthorized, or for other reasons an approved JD cannot be completed in a timely manner. In such circumstances, a preliminary JD may serve as the basis for Corps compliance orders (e.g., cease and desist letters, initial corrective measures).  The Corps should support an enforcement action with an approved JD unless it is impracticable to do so under the circumstances, such as where access to the site is prohibited.

    f.  When the Corps provides a preliminary JD, or authorizes an activity based on a preliminary JD, the Corps is making no legally binding determination of any type regarding whether CWA/RHA jurisdiction exists over the particular water body or wetland in question.

    g.  A preliminary JD is "preliminary" in the sense that a recipient of a preliminary JD can later request and obtain an approved JD if that later becomes necessary or appropriate during the permit process or during the administrative appeal process.  If a

19

permit applicant elects to seek a Corps individual permit based on a preliminary JD, that permit applicant can later raise jurisdictional issues as part of an administrative appeal of a proffered permit or a permit denial, as explained in paragraph 6 below.

h. In all circumstances where an approved JD is not required by the guidance in paragraph 2 of this RGL, District Engineers retain authority to use preliminary JDs. The Corps may authorize an activity with one or more general permits, a letter of permission, or a standard individual permit, with no "official" JD of any type, or based on a preliminary JD, where the District Engineer determines that to be appropriate, and where the permit applicant has been made aware of his or her option to receive an approved JD and has declined to exercise that option. Generally, approved JDs should be used to support individual permit applications, but the applicant should be made aware of his or her option to elect to use a preliminary JD wherever the applicant feels doing so is in his or her best interest.

5. Processing approved and preliminary JDs. Every approved JD and preliminary JD should be completed and provided to the person, organization, or agency requesting it as promptly as is practicable in light of the district's workload, and site and weather conditions if a site visit is determined necessary.

a. Corps districts should not give preliminary JDs priority over approved JDs. Moreover, every Corps district should ensure that a permit applicant's request for an approved JD rather than a preliminary JD will not prejudice the timely processing of that permit application. It is the Corps' goal that every JD requested by an affected party should be completed within 60 calendar days of receiving the request. Regulatory Project Managers will notify their supervisors and develop a schedule for completion of the JD if it is not practicable to meet this 60 day goal.

b. The Corps should not provide either an approved JD or a preliminary JD to any person if the Corps has reason to believe that person is seeking a JD for any purpose relating to a CWA program not administered by the Corps (e.g., CWA Section 402, 303, or 311). In such circumstances the Corps should decline to perform the JD and instead refer the person who requested it to the Federal or state agency responsible for administering that program.

6. JDs and appeals. In any circumstance where a permit applicant obtains a Corps proffered individual permit or a permit denial, based on a preliminary JD, and where the permit applicant elects to pursue an administrative appeal of the proffered permit or the permit denial, the appeal "may include jurisdiction issues," as stated in 33 C.F.R. 331.5(a)(2). However, if an affected party during the appeal of a proffered permit or a permit denial challenges or questions jurisdiction, those jurisdictional issues must be addressed with an approved JD. Therefore, if, during or as a result of the administrative appeal of the permit denial or the terms and conditions of the proffered permit, it becomes necessary to make an official determination whether CWA/RHA jurisdiction exists over a site, or to provide an official delineation of jurisdictional waters on the site, the Corps should provide an approved JD as soon as is practicable, consistent with the

20

goal expressed in paragraph 5 above. Such an approved JD would be subject to the same procedures as other approved JDs, such as requirements for coordinating approved JDs with EPA.

7. <u>Key distinction between approved JDs and preliminary JDs</u>. By definition, a preliminary JD can only be used to determine that wetlands or other water bodies that exist on a particular site "may be" jurisdictional waters of the United States. A preliminary JD by definition cannot be used to determine either that there are no wetlands or other water bodies on a site at all (i.e., that there are no aquatic resources on the site and the entire site is comprised of uplands), or that there are no jurisdictional wetlands or other water bodies on a site, or that only a portion of the wetlands or waterbodies on a site are jurisdictional. A definitive, official determination that there are, or that there are not, jurisdictional "waters of the United States" on a site can only made by an approved JD. The Corps retains the ability to use a "no-permit-required" letter to indicate that a specific proposed activity is not subject to CWA/RHA jurisdiction when that is determined appropriate, but a "no-permit-required" letter cannot make any sort of determination regarding whether there are jurisdictional wetlands or other waterbodies on a site.

8. <u>Mandatory use of the preliminary JD form</u>. In each and every circumstance where a preliminary JD is used, the Corps district must complete the "Preliminary Jurisdictional Determination Form" provided at Attachment 1, which sets forth in writing the minimum requirements for a preliminary JD and important information concerning the requesting party's option to request and obtain an approved JD, and subsequent appeal rights. The signature of the affected party who requested the preliminary JD will be obtained on the preliminary JD form wherever practicable (e.g., except for enforcement situations, etc.). Where a preliminary JD form covers multiple water bodies or multiple sites, the information for each can be included in the table provided with the preliminary JD form. Information in addition to the minimum of data required on the preliminary JD form can be included on that form, but only if such information pertains to the amount and location of wetlands or other water bodies at the site. Corps regulatory personnel are expected to continue to exercise appropriate judgment and use appropriate information when making technical and scientific determinations as to what areas on the site qualify as water bodies or wetlands. Any such additional information included on the preliminary JD form should not purport, or be construed, to address any legal determination involving CWA/RHA jurisdiction on the site.

9. <u>Data collection</u>. Information about the quality and quantity of the aquatic resources that would be affected by the proposed activity, the types of impacts that are expected to occur, and compensatory mitigation, are obtained by the Corps during the processing of an individual permit application and are included in pre-construction notification for reporting NWPs. For example, NWP pre-construction notifications must contain a "description of the proposed project; the project's purpose; direct and indirect adverse environmental effects the project would cause; . . . a delineation of special aquatic sites and other waters of the United States on the project site." (Reissuance of Nationwide Permits Notice, 72 Fed. Reg. 11092, at 11194-95 (March 12, 2007).) Applicants should

21

provide a delineation of special aquatic sites in support of an individual permit or "letter of permission" application.

    a.  The information on a preliminary JD form should be limited to the amount and location of wetlands and other water bodies on the site and should be sufficiently accurate and reliable that the effective presumption of CWA/RHA jurisdiction over all of the wetlands and other water bodies at the site will support a reliable and enforceable permit decision.  When a preliminary JD is used to support a request for a permit authorization, the information on the preliminary JD form is also relevant to the processing of that permit application (e.g., to calculate compensatory mitigation requirements).  During the permit process, information in addition to the data on the preliminary JD form is developed and relied upon to support the Corps permit decision; that additional information should be carefully documented as part of the permit process (e.g., through an environmental assessment, 404(b)(1) analysis, combined decision document, or decision memorandum).  This additional information for the permit decision should *not* be captured on a preliminary JD form.

    b.  The type of information collected to support the decision on the permit application will be the same for permit applications supported by approved JDs and for those supported by preliminary JDs.  Therefore, decisions and judgments regarding environmental impacts, public interest determinations, and mitigation requirements should be adequately supported regardless of the type of JD used.  For this reason, the data necessary to quantify and defend the Corps Regulatory Program's performance will be available for a permit application regardless of whether it was supported by an approved JD or a preliminary JD.

    c.  The information used to support an approved JD should be reliable and verifiable.  Traditionally, this information has been obtained or verified though a site visit, but now, with information from new, highly sensitive technology and imaging, site visits may not always be required for approved JDs.

    d.  When documenting preliminary JDs, any available technical, scientific, and observational information about the wetlands or other water bodies can be entered into ORM2 regardless of whether it is the type of information that could inform a formal jurisdictional determination (e.g., discussion of the ecological relationship between water bodies), so long as legal conclusions about jurisdictional status are not included.  Any additional, available information that is entered into ORM2 must be accompanied by the warning that the information has not been verified, that it is not an official determination by the government, and that it cannot later be relied upon to determine whether an area is or is not jurisdictional.

10.  Coordination with U.S. Environmental Protection Agency (EPA) and posting.  Districts will continue to post approved JDs on their web sites. Consistent with historical practice, preliminary JDs will not be coordinated with EPA or posted on District websites. Corps Headquarters is modifying the ORM2 data base to collect information regarding use of preliminary JDs, and regarding permit authorizations based on

preliminary JDs, or based on no official form of JD. Until ORM2 is modified to collect and access information related to preliminary JDs, every District should collect basic information, to the maximum extent practicable, on those subjects for purposes of documenting District workload.

11. This guidance remains in effect until revised or rescinded.

Attachment

DON T. RILEY
Major General, US Army
Deputy Commanding General for Civil and
Emergency Operations

23

**ATTACHMENT**

**PRELIMINARY JURISDICTIONAL DETERMINATION FORM**

**BACKGROUND INFORMATION**

**A.    REPORT COMPLETION DATE FOR PRELIMINARY JURISDICTIONAL DETERMINATION (JD):**

**B.    NAME AND ADDRESS OF PERSON REQUESTING PRELIMINARY JD:**

**C.    DISTRICT OFFICE, FILE NAME, AND NUMBER:**

**D.    PROJECT LOCATION(S) AND BACKGROUND INFORMATION:**
**(USE THE ATTACHED TABLE TO DOCUMENT MULTIPLE WATERBODIES AT DIFFERENT SITES)**

State:                County/parish/borough:        City:

Center coordinates of site (lat/long in degree decimal format):  Lat.        °

**Pick List**, Long.        ° **Pick List.**

Universal Transverse Mercator:

Name of nearest waterbody:

Identify (estimate) amount of waters in the review area:

Non-wetland waters:        linear feet:        width (ft) and/or        acres.
Cowardin Class:
Stream Flow:
Wetlands:        acres.
Cowardin Class:

Name of any water bodies on the site that have been identified as Section 10 waters:

Tidal:

Non-Tidal:

**E.    REVIEW PERFORMED FOR SITE EVALUATION (CHECK ALL THAT APPLY):**

☐ Office (Desk) Determination.  Date:

☐ Field Determination.  Date(s):

1. The Corps of Engineers believes that there may be jurisdictional waters of the United States on the subject site, and the permit applicant or other affected party who requested this preliminary JD is hereby advised of his or her option to request and obtain an approved jurisdictional determination (JD) for that site. Nevertheless, the permit applicant or other person who requested this preliminary JD has declined to exercise the option to obtain an approved JD in this instance and at this time.

2. In any circumstance where a permit applicant obtains an individual permit, or a Nationwide General Permit (NWP) or other general permit verification requiring "pre-construction notification" (PCN), or requests verification for a non-reporting NWP or other general permit, and the permit applicant has not requested an approved JD for the activity, the permit applicant is hereby made aware of the following: (1) the permit applicant has elected to seek a permit authorization based on a preliminary JD, which does not make an official determination of jurisdictional waters; (2) that the applicant has the option to request an approved JD before accepting the terms and conditions of the permit authorization, and that basing a permit authorization on an approved JD could possibly result in less compensatory mitigation being required or different special conditions; (3) that the applicant has the right to request an individual permit rather than accepting the terms and conditions of the NWP or other general permit authorization; (4) that the applicant can accept a permit authorization and thereby agree to comply with all the terms and conditions of that permit, including whatever mitigation requirements the Corps has determined to be necessary; (5) that undertaking any activity in reliance upon the subject permit authorization without requesting an approved JD constitutes the applicant's acceptance of the use of the preliminary JD, but that either form of JD will be processed as soon as is practicable; (6) accepting a permit authorization (e.g., signing a proffered individual permit) or undertaking any activity in reliance on any form of Corps permit authorization based on a preliminary JD constitutes agreement that all wetlands and other water bodies on the site affected in any way by that activity are jurisdictional waters of the United States, and precludes any challenge to such jurisdiction in any administrative or judicial compliance or enforcement action, or in any administrative appeal or in any Federal court; and (7) whether the applicant elects to use either an approved JD or a preliminary JD, that JD will be processed as soon as is practicable. Further, an approved JD, a proffered individual permit (and all terms and conditions contained therein), or individual permit denial can be administratively appealed pursuant to 33 C.F.R. Part 331, and that in any administrative appeal, jurisdictional issues can be raised (see 33 C.F.R. 331.5(a)(2)). If, during that administrative appeal, it becomes necessary to make an official determination whether CWA jurisdiction exists over a site, or to provide an official delineation of jurisdictional waters on the site, the Corps will provide an approved JD to accomplish that result, as soon as is practicable. This preliminary JD finds that there *"may be"* waters of the United States on the subject project site, and identifies all aquatic features on the site that could be affected by the proposed activity, based on the following information:

**SUPPORTING DATA. Data reviewed for preliminary JD (check all that apply - checked items should be included in case file and, where checked and requested, appropriately reference sources below):**

☐ Maps, plans, plots or plat submitted by or on behalf of the applicant/consultant:        .

☐ Data sheets prepared/submitted by or on behalf of the applicant/consultant.
    ☐ Office concurs with data sheets/delineation report.
    ☐ Office does not concur with data sheets/delineation report.

☐ Data sheets prepared by the Corps:

☐ Corps navigable waters' study:

☐ U.S. Geological Survey Hydrologic Atlas:
    ☐ USGS NHD data.
    ☐ USGS 8 and 12 digit HUC maps.

☐ U.S. Geological Survey map(s). Cite scale & quad name:

☐ USDA Natural Resources Conservation Service Soil Survey. Citation:

☐ National wetlands inventory map(s). Cite name:

☐ State/Local wetland inventory map(s):

☐ FEMA/FIRM maps:

☐ 100-year Floodplain Elevation is:        (National Geodectic Vertical Datum of 1929)

☐ Photographs: ☐ Aerial (Name & Date):

        or ☐ Other (Name & Date):

☐ Previous determination(s). File no. and date of response letter:

☐ Other information (please specify):

**IMPORTANT NOTE: The information recorded on this form has not necessarily been verified by the Corps and should not be relied upon for later jurisdictional determinations.**

| | |
|---|---|
| _____ | _____ |
| Signature and date of Regulatory Project Manager (REQUIRED) | Signature and date of person requesting preliminary JD (REQUIRED, unless obtaining the signature is impracticable) |

SAMPLE

| Site number | Latitude | Longitude | Cowardin Class | Estimated amount of aquatic resource in review area | Class of aquatic resource |
|---|---|---|---|---|---|
| 1 | | | | 0.1 acre | section 10 – tidal |
| 2 | | | | 100 linear feet | section 10 – non-tidal |
| 3 | | | | 15 square feet | non-section 10 – wetland |
| 4 | | | | 0.01 acre | non-section 10 – non-wetland |
| | | | | | |
| | | | | | |

**APPROVED JURISDICTIONAL DETERMINATION FORM**
**U.S. Army Corps of Engineers**

This form should be completed by following the instructions provided in Section IV of the JD Form Instructional Guidebook.

**SECTION I: BACKGROUND INFORMATION**
**A.  REPORT COMPLETION DATE FOR APPROVED JURISDICTIONAL DETERMINATION (JD):**

**B.  DISTRICT OFFICE, FILE NAME, AND NUMBER:**

**C.  PROJECT LOCATION AND BACKGROUND INFORMATION:**
State:            County/parish/borough:            City:
Center coordinates of site (lat/long in degree decimal format): Lat.    ° Pick List, Long.    ° Pick List.
                      Universal Transverse Mercator:
Name of nearest waterbody:
Name of nearest Traditional Navigable Water (TNW) into which the aquatic resource flows:
Name of watershed or Hydrologic Unit Code (HUC):
☐ Check if map/diagram of review area and/or potential jurisdictional areas is/are available upon request.
☐ Check if other sites (e.g., offsite mitigation sites, disposal sites, etc...) are associated with this action and are recorded on a different JD form.

**D.  REVIEW PERFORMED FOR SITE EVALUATION (CHECK ALL THAT APPLY):**
☐ Office (Desk) Determination. Date:
☐ Field Determination. Date(s):

**SECTION II: SUMMARY OF FINDINGS**
**A.  RHA SECTION 10 DETERMINATION OF JURISDICTION.**

There Pick List "*navigable waters of the U.S.*" within Rivers and Harbors Act (RHA) jurisdiction (as defined by 33 CFR part 329) in the review area. [*Required*]
☐ Waters subject to the ebb and flow of the tide.
☐ Waters are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce. Explain:         .

**B.  CWA SECTION 404 DETERMINATION OF JURISDICTION.**

There Pick List "*waters of the U.S.*" within Clean Water Act (CWA) jurisdiction (as defined by 33 CFR part 328) in the review area. [*Required*]

1. **Waters of the U.S.**
   a. **Indicate presence of waters of U.S. in review area (check all that apply):** [1]
      ☐ TNWs, including territorial seas
      ☐ Wetlands adjacent to TNWs
      ☐ Relatively permanent waters[2] (RPWs) that flow directly or indirectly into TNWs
      ☐ Non-RPWs that flow directly or indirectly into TNWs
      ☐ Wetlands directly abutting RPWs that flow directly or indirectly into TNWs
      ☐ Wetlands adjacent to but not directly abutting RPWs that flow directly or indirectly into TNWs
      ☐ Wetlands adjacent to non-RPWs that flow directly or indirectly into TNWs
      ☐ Impoundments of jurisdictional waters
      ☐ Isolated (interstate or intrastate) waters, including isolated wetlands

   b. **Identify (estimate) size of waters of the U.S. in the review area:**
      Non-wetland waters:      linear feet:      width (ft) and/or      acres.
      Wetlands:      acres.

   c. **Limits (boundaries) of jurisdiction based on:** Pick List
      Elevation of established OHWM (if known):      .

2. **Non-regulated waters/wetlands (check if applicable):** [3]
   ☐ Potentially jurisdictional waters and/or wetlands were assessed within the review area and determined to be not jurisdictional. Explain:      .

---

[1] Boxes checked below shall be supported by completing the appropriate sections in Section III below.
[2] For purposes of this form, an RPW is defined as a tributary that is not a TNW and that typically flows year-round or has continuous flow at least "seasonally" (e.g., typically 3 months).
[3] Supporting documentation is presented in Section III.F.

2

<u>SECTION III: CWA ANALYSIS</u>

A. **TNWs AND WETLANDS ADJACENT TO TNWs**

The agencies will assert jurisdiction over TNWs and wetlands adjacent to TNWs. If the aquatic resource is a TNW, complete Section III.A.1 and Section III.D.1. only; if the aquatic resource is a wetland adjacent to a TNW, complete Sections III.A.1 and 2 and Section III.D.1.; otherwise, see Section III.B below.

1. **TNW**
   Identify TNW:          .

   Summarize rationale supporting determination:          .

2. **Wetland adjacent to TNW**
   Summarize rationale supporting conclusion that wetland is "adjacent":          .

B. **CHARACTERISTICS OF TRIBUTARY (THAT IS NOT A TNW) AND ITS ADJACENT WETLANDS (IF ANY):**

This section summarizes information regarding characteristics of the tributary and its adjacent wetlands, if any, and it helps determine whether or not the standards for jurisdiction established under *Rapanos* have been met.

The agencies will assert jurisdiction over non-navigable tributaries of TNWs where the tributaries are "relatively permanent waters" (RPWs), i.e. tributaries that typically flow year-round or have continuous flow at least seasonally (e.g., typically 3 months). A wetland that directly abuts an RPW is also jurisdictional. If the aquatic resource is not a TNW, but has year-round (perennial) flow, skip to Section III.D.2. If the aquatic resource is a wetland directly abutting a tributary with perennial flow, skip to Section III.D.4.

A wetland that is adjacent to but that does not directly abut an RPW requires a significant nexus evaluation. Corps districts and EPA regions will include in the record any available information that documents the existence of a significant nexus between a relatively permanent tributary that is not perennial (and its adjacent wetlands if any) and a traditional navigable water, even though a significant nexus finding is not required as a matter of law.

If the waterbody[4] is not an RPW, or a wetland directly abutting an RPW, a JD will require additional data to determine if the waterbody has a significant nexus with a TNW. If the tributary has adjacent wetlands, the significant nexus evaluation must consider the tributary in combination with all of its adjacent wetlands. This significant nexus evaluation that combines, for analytical purposes, the tributary and all of its adjacent wetlands is used whether the review area identified in the JD request is the tributary, or its adjacent wetlands, or both. If the JD covers a tributary with adjacent wetlands, complete Section III.B.1 for the tributary, Section III.B.2 for any onsite wetlands, and Section III.B.3 for all wetlands adjacent to that tributary, both onsite and offsite. The determination whether a significant nexus exists is determined in Section III.C below.

1. **Characteristics of non-TNWs that flow directly or indirectly into TNW**

   (i) **General Area Conditions:**
   Watershed size:          Pick List
   Drainage area:          Pick List
   Average annual rainfall:          inches
   Average annual snowfall:          inches

   (ii) **Physical Characteristics:**
   (a) Relationship with TNW:
   ☐ Tributary flows directly into TNW.
   ☐ Tributary flows through Pick List tributaries before entering TNW.

   Project waters are Pick List river miles from TNW.
   Project waters are Pick List river miles from RPW.
   Project waters are Pick List aerial (straight) miles from TNW.
   Project waters are Pick List aerial (straight) miles from RPW.
   Project waters cross or serve as state boundaries. Explain:          .

   Identify flow route to TNW[5]:          .
   Tributary stream order, if known:          .

---

[4] Note that the Instructional Guidebook contains additional information regarding swales, ditches, washes, and erosional features generally and in the arid West.
[5] Flow route can be described by identifying, e.g., tributary a, which flows through the review area, to flow into tributary b, which then flows into TNW.

3

(b) <u>General Tributary Characteristics (check all that apply):</u>
    **Tributary is:** ☐ Natural
              ☐ Artificial (man-made). Explain: .
              ☐ Manipulated (man-altered). Explain: .

    **Tributary** properties with respect to top of bank (estimate):
        Average width:    feet
        Average depth:    feet
        Average side slopes: Pick List.

    Primary tributary substrate composition (check all that apply):
        ☐ Silts        ☐ Sands                 ☐ Concrete
        ☐ Cobbles    ☐ Gravel               ☐ Muck
        ☐ Bedrock    ☐ Vegetation. Type/% cover:
        ☐ Other. Explain: .

    Tributary condition/stability [e.g., highly eroding, sloughing banks]. Explain: .
    Presence of run/riffle/pool complexes. Explain: .
    Tributary geometry: Pick List
    Tributary gradient (approximate average slope):    %

(c) <u>Flow:</u>
    Tributary provides for: Pick List
    Estimate average number of flow events in review area/year: Pick List
        Describe flow regime: .
    Other information on duration and volume: .

    Surface flow is: Pick List. Characteristics: .

    Subsurface flow: Pick List. Explain findings: .
        ☐ Dye (or other) test performed: .

    Tributary has (check all that apply):
        ☐ Bed and banks
        ☐ OHWM[6] (check all indicators that apply):
           ☐ clear, natural line impressed on the bank    ☐ the presence of litter and debris
           ☐ changes in the character of soil          ☐ destruction of terrestrial vegetation
           ☐ shelving                         ☐ the presence of wrack line
           ☐ vegetation matted down, bent, or absent    ☐ sediment sorting
           ☐ leaf litter disturbed or washed away     ☐ scour
           ☐ sediment deposition             ☐ multiple observed or predicted flow events
           ☐ water staining                ☐ abrupt change in plant community
           ☐ other (list):
        ☐ Discontinuous OHWM.[7] Explain: .

    If factors other than the OHWM were used to determine lateral extent of CWA jurisdiction (check all that apply):
        ☑ High Tide Line indicated by:        ☑ Mean High Water Mark indicated by:
           ☐ oil or scum line along shore objects     ☐ survey to available datum;
           ☐ fine shell or debris deposits (foreshore)   ☐ physical markings;
           ☐ physical markings/characteristics        ☐ vegetation lines/changes in vegetation types.
           ☐ tidal gauges
           ☐ other (list):

(iii) **Chemical Characteristics:**
    Characterize tributary (e.g., water color is clear, discolored, oily film; water quality; general watershed characteristics, etc.).
        Explain: .
    Identify specific pollutants, if known: .

---

[6]A natural or man-made discontinuity in the OHWM does not necessarily sever jurisdiction (e.g., where the stream temporarily flows underground, or where the OHWM has been removed by development or agricultural practices). Where there is a break in the OHWM that is unrelated to the waterbody's flow regime (e.g., flow over a rock outcrop or through a culvert), the agencies will look for indicators of flow above and below the break.
[7]Ibid.

                                                              4

(iv) **Biological Characteristics. Channel supports (check all that apply):**
☐ Riparian corridor. Characteristics (type, average width):    .
☐ Wetland fringe. Characteristics:    .
☐ Habitat for:
☐ Federally Listed species. Explain findings:    .
☐ Fish/spawn areas. Explain findings:    .
☐ Other environmentally-sensitive species. Explain findings:    .
☐ Aquatic/wildlife diversity. Explain findings:    .

2. **Characteristics of wetlands adjacent to non-TNW that flow directly or indirectly into TNW**

(i) **Physical Characteristics:**
(a) <u>General Wetland Characteristics:</u>
Properties:
Wetland size:    acres
Wetland type. Explain:    .
Wetland quality. Explain:    .
Project wetlands cross or serve as state boundaries. Explain:    .

(b) <u>General Flow Relationship with Non-TNW:</u>
Flow is: **Pick List**. Explain:    .

Surface flow is: **Pick List**
Characteristics:    .

Subsurface flow: **Pick List**. Explain findings:    .
☐ Dye (or other) test performed:    .

(c) <u>Wetland Adjacency Determination with Non-TNW:</u>
☐ Directly abutting
☐ Not directly abutting
☐ Discrete wetland hydrologic connection. Explain:    .
☐ Ecological connection. Explain:    .
☐ Separated by berm/barrier. Explain:    .

(d) <u>Proximity (Relationship) to TNW</u>
Project wetlands are **Pick List** river miles from TNW.
Project waters are **Pick List** aerial (straight) miles from TNW.
Flow is from: **Pick List**.
Estimate approximate location of wetland as within the **Pick List** floodplain.

(ii) **Chemical Characteristics:**
Characterize wetland system (e.g., water color is clear, brown, oil film on surface; water quality; general watershed characteristics; etc.). Explain:    .
Identify specific pollutants, if known:    .

(iii) **Biological Characteristics. Wetland supports (check all that apply):**
☐ Riparian buffer. Characteristics (type, average width):    .
☐ Vegetation type/percent cover. Explain:    .
☐ Habitat for:
☐ Federally Listed species. Explain findings:    .
☐ Fish/spawn areas. Explain findings:    .
☐ Other environmentally-sensitive species. Explain findings:    .
☐ Aquatic/wildlife diversity. Explain findings:    .

3. **Characteristics of all wetlands adjacent to the tributary (if any)**
All wetland(s) being considered in the cumulative analysis: **Pick List**
Approximately (    ) acres in total are being considered in the cumulative analysis.

5

For each wetland, specify the following:

<u>Directly abuts? (Y/N)</u>    <u>Size (in acres)</u>        <u>Directly abuts? (Y/N)</u>    <u>Size (in acres)</u>

Summarize overall biological, chemical and physical functions being performed:        .

C.  **SIGNIFICANT NEXUS DETERMINATION**

A significant nexus analysis will assess the flow characteristics and functions of the tributary itself and the functions performed by any wetlands adjacent to the tributary to determine if they significantly affect the chemical, physical, and biological integrity of a TNW.  For each of the following situations, a significant nexus exists if the tributary, in combination with all of its adjacent wetlands, has more than a speculative or insubstantial effect on the chemical, physical and/or biological integrity of a TNW. Considerations when evaluating significant nexus include, but are not limited to, the volume, duration, and frequency of the flow of water in the tributary and its proximity to a TNW, and the functions performed by the tributary and all its adjacent wetlands.  It is not appropriate to determine significant nexus based solely on any specific threshold of distance (e.g. between a tributary and its adjacent wetland or between a tributary and the TNW). Similarly, the fact an adjacent wetland lies within or outside of a floodplain is not solely determinative of significant nexus.

Draw connections between the features documented and the effects on the TNW, as identified in the *Rapanos* Guidance and discussed in the Instructional Guidebook. Factors to consider include, for example:
- Does the tributary, in combination with its adjacent wetlands (if any), have the capacity to carry pollutants or flood waters to TNWs, or to reduce the amount of pollutants or flood waters reaching a TNW?
- Does the tributary, in combination with its adjacent wetlands (if any), provide habitat and lifecycle support functions for fish and other species, such as feeding, nesting, spawning, or rearing young for species that are present in the TNW?
- Does the tributary, in combination with its adjacent wetlands (if any), have the capacity to transfer nutrients and organic carbon that support downstream foodwebs?
- Does the tributary, in combination with its adjacent wetlands (if any), have other relationships to the physical, chemical, or biological integrity of the TNW?

Note: the above list of considerations is not inclusive and other functions observed or known to occur should be documented below:

1.  **Significant nexus findings for non-RPW that has no adjacent wetlands and flows directly or indirectly into TNWs.** Explain findings of presence or absence of significant nexus below, based on the tributary itself, then go to Section III.D:        .

2.  **Significant nexus findings for non-RPW and its adjacent wetlands, where the non-RPW flows directly or indirectly into TNWs.** Explain findings of presence or absence of significant nexus below, based on the tributary in combination with all of its adjacent wetlands, then go to Section III.D:        .

3.  **Significant nexus findings for wetlands adjacent to an RPW but that do not directly abut the RPW.** Explain findings of presence or absence of significant nexus below, based on the tributary in combination with all of its adjacent wetlands, then go to Section III.D:        .

D.  **DETERMINATIONS OF JURISDICTIONAL FINDINGS. THE SUBJECT WATERS/WETLANDS ARE (CHECK ALL THAT APPLY):**

1.  **TNWs and Adjacent Wetlands.** Check all that apply and provide size estimates in review area:
    ☐ TNWs:        linear feet        width (ft) Or,        acres.
    ☒ Wetlands adjacent to TNWs:        acres.

2.  **RPWs that flow directly or indirectly into TNWs.**
    ☐ Tributaries of TNWs where tributaries typically flow year-round are jurisdictional. Provide data and rationale indicating that tributary is perennial:        .
    ☐ Tributaries of TNW where tributaries have continuous flow "seasonally" (e.g., typically three months each year) are jurisdictional.  Data supporting this conclusion is provided at Section III.B. Provide rationale indicating that tributary flows seasonally:        .

6

Provide estimates for jurisdictional waters in the review area (check all that apply):
☐ Tributary waters:            linear feet        width (ft).
☐ Other non-wetland waters:        acres.
Identify type(s) of waters:        .

3. **Non-RPWs[8] that flow directly or indirectly into TNWs.**
☐ Waterbody that is not a TNW or an RPW, but flows directly or indirectly into a TNW, and it has a significant nexus with a TNW is jurisdictional. Data supporting this conclusion is provided at Section III.C.

Provide estimates for jurisdictional waters within the review area (check all that apply):
☐ Tributary waters:            linear feet        width (ft).
☐ Other non-wetland waters:        acres.
Identify type(s) of waters:        .

4. **Wetlands directly abutting an RPW that flow directly or indirectly into TNWs.**
☐ Wetlands directly abut RPW and thus are jurisdictional as adjacent wetlands.
☐ Wetlands directly abutting an RPW where tributaries typically flow year-round. Provide data and rationale indicating that tributary is perennial in Section III.D.2, above. Provide rationale indicating that wetland is directly abutting an RPW:        .

☐ Wetlands directly abutting an RPW where tributaries typically flow "seasonally." Provide data indicating that tributary is seasonal in Section III.B and rationale in Section III.D.2, above. Provide rationale indicating that wetland is directly abutting an RPW:        .

Provide acreage estimates for jurisdictional wetlands in the review area:        acres.

5. **Wetlands adjacent to but not directly abutting an RPW that flow directly or indirectly into TNWs.**
☐ Wetlands that do not directly abut an RPW, but when considered in combination with the tributary to which they are adjacent and with similarly situated adjacent wetlands, have a significant nexus with a TNW are jurisdictional. Data supporting this conclusion is provided at Section III.C.

Provide acreage estimates for jurisdictional wetlands in the review area:        acres.

6. **Wetlands adjacent to non-RPWs that flow directly or indirectly into TNWs.**
☐ Wetlands adjacent to such waters, and have when considered in combination with the tributary to which they are adjacent and with similarly situated adjacent wetlands, have a significant nexus with a TNW are jurisdictional. Data supporting this conclusion is provided at Section III.C.

Provide estimates for jurisdictional wetlands in the review area:        acres.

7. **Impoundments of jurisdictional waters.[9]**
As a general rule, the impoundment of a jurisdictional tributary remains jurisdictional.
☐ Demonstrate that impoundment was created from "waters of the U.S.," or
☐ Demonstrate that water meets the criteria for one of the categories presented above (1-6), or
☐ Demonstrate that water is isolated with a nexus to commerce (see E below).

E. **ISOLATED [INTERSTATE OR INTRA-STATE] WATERS, INCLUDING ISOLATED WETLANDS, THE USE, DEGRADATION OR DESTRUCTION OF WHICH COULD AFFECT INTERSTATE COMMERCE, INCLUDING ANY SUCH WATERS (CHECK ALL THAT APPLY):[10]**
☐ which are or could be used by interstate or foreign travelers for recreational or other purposes.
☐ from which fish or shellfish are or could be taken and sold in interstate or foreign commerce.
☐ which are or could be used for industrial purposes by industries in interstate commerce.
☐ Interstate isolated waters. Explain:        .
☐ Other factors. Explain:        .

**Identify water body and summarize rationale supporting determination:**        .

---

[8] See Footnote # 3.
[9] To complete the analysis refer to the key in Section III.D.6 of the Instructional Guidebook.
[10] Prior to asserting or declining CWA jurisdiction based solely on this category, Corps Districts will elevate the action to Corps and EPA HQ for review consistent with the process described in the Corps/EPA *Memorandum Regarding CWA Act Jurisdiction Following Rapanos*.

7

Provide estimates for jurisdictional waters in the review area (check all that apply):
☐ Tributary waters:    linear feet    width (ft).
☑ Other non-wetland waters:    acres.
   Identify type(s) of waters:    .
☐ Wetlands:    acres.

**F.   NON-JURISDICTIONAL WATERS, INCLUDING WETLANDS (CHECK ALL THAT APPLY):**
☐ If potential wetlands were assessed within the review area, these areas did not meet the criteria in the 1987 Corps of Engineers Wetland Delineation Manual and/or appropriate Regional Supplements.
☐ Review area included isolated waters with no substantial nexus to interstate (or foreign) commerce.
   ☐ Prior to the Jan 2001 Supreme Court decision in "*SWANCC*," the review area would have been regulated based solely on the "Migratory Bird Rule" (MBR).
☑ Waters do not meet the "Significant Nexus" standard, where such a finding is required for jurisdiction. Explain;    .
☐ Other: (explain, if not covered above):    .

Provide acreage estimates for non-jurisdictional waters in the review area, where the sole potential basis of jurisdiction is the MBR factors (i.e., presence of migratory birds, presence of endangered species, use of water for irrigated agriculture), using best professional judgment (check all that apply):
☑ Non-wetland waters (i.e., rivers, streams):    linear feet    width (ft).
☐ Lakes/ponds:    acres.
☐ Other non-wetland waters:    acres. List type of aquatic resource:    .
☐ Wetlands:    acres.

Provide acreage estimates for non-jurisdictional waters in the review area that do not meet the "Significant Nexus" standard, where such a finding is required for jurisdiction (check all that apply):
☐ Non-wetland waters (i.e., rivers, streams):    linear feet,    width (ft).
☐ Lakes/ponds:    acres.
☐ Other non-wetland waters:    acres. List type of aquatic resource:    .
☐ Wetlands:    acres.

## SECTION IV: DATA SOURCES.

**A.   SUPPORTING DATA. Data reviewed for JD (check all that apply** - checked items shall be included in case file and, where checked and requested, appropriately reference sources below):
☐ Maps, plans, plots or plat submitted by or on behalf of the applicant/consultant:    .
☑ Data sheets prepared/submitted by or on behalf of the applicant/consultant.
   ☐ Office concurs with data sheets/delineation report.
   ☐ Office does not concur with data sheets/delineation report.
☐ Data sheets prepared by the Corps:    .
☐ Corps navigable waters' study:    .
☐ U.S. Geological Survey Hydrologic Atlas:    .
   ☐ USGS NHD data.
   ☐ USGS 8 and 12 digit HUC maps.
☐ U.S. Geological Survey map(s). Cite scale & quad name:    .
☐ USDA Natural Resources Conservation Service Soil Survey. Citation:    .
☐ National wetlands inventory map(s). Cite name:    .
☐ State/Local wetland inventory map(s):    .
☐ FEMA/FIRM maps:    .
☐ 100-year Floodplain Elevation is:    (National Geodetic Vertical Datum of 1929)
☐ Photographs: ☐ Aerial (Name & Date):    .
          or ☐ Other (Name & Date):    .
☐ Previous determination(s). File no. and date of response letter:    .
☐ Applicable/supporting case law:    .
☐ Applicable/supporting scientific literature:    .
☑ Other information (please specify):    .

**B.   ADDITIONAL COMMENTS TO SUPPORT JD:**    .

8